381 U.S. 657 (1965)
UNITED MINE WORKERS OF AMERICA
v.
PENNINGTON ET AL.
No. 48.
Supreme Court of United States.
Argued January 27, 1965.
Decided June 7, 1965.
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT.
*658 Harrison Combs argued the cause for petitioner. With him on the briefs were E. H. Rayson, R. R. Kramer and M. E. Boiarsky.
John A. Rowntree argued the cause and filed briefs for respondents.
Theodore J. St. Antoine argued the cause for the American Federation of Labor and Congress of Industrial *659 Organizations, as amicus curiae, urging reversal. With him on the brief were J. Albert Woll, Robert C. Mayer and Thomas E. Harris.
Guy Farmer filed a brief for the Bituminous Coal Operators' Association, as amicus curiae, urging reversal.
MR. JUSTICE WHITE delivered the opinion of the Court.
This action began as a suit by the trustees of the United Mine Workers of America Welfare and Retirement Fund against the respondents, individually and as owners of Phillips Brothers Coal Company, a partnership, seeking to recover some $55,000 in royalty payments alleged to be due and payable under the trust provisions of the National Bituminous Coal Wage Agreement of 1950, as amended, September 29, 1952, executed by Phillips and United Mine Workers of America on or about October 1, 1953, and re-executed with amendments on or about September 8, 1955, and October 22, 1956. Phillips filed an answer and a cross claim against UMW, alleging in both that the trustees, the UMW and certain large coal operators had conspired to restrain and to monopolize interstate commerce in violation of §§ 1 and 2 of the Sherman Antitrust Act, as amended, 26 Stat. 209, 15 U. S. C. §§ 1, 2 (1958 ed.). Actual damages in the amount of $100,000 were claimed for the period beginning February 14, 1954, and ending December 31, 1958.[1]
The allegations of the cross claim were essentially as follows: Prior to the 1950 Wage Agreement between the operators and the union, severe controversy had existed in the industry, particularly over wages, the welfare fund and the union's efforts to control the working time of *660 its members. Since 1950, however, relative peace has existed in the industry, all as the result of the 1950 Wage Agreement and its amendments and the additional understandings entered into between UMW and the large operators. Allegedly the parties considered overproduction to be the critical problem of the coal industry. The agreed solution was to be the elimination of the smaller companies, the larger companies thereby controlling the market. More specifically, the union abandoned its efforts to control the working time of the miners, agreed not to oppose the rapid mechanization of the mines which would substantially reduce mine employment, agreed to help finance such mechanization and agreed to impose the terms of the 1950 agreement on all operators without regard to their ability to pay. The benefit to the union was to be increased wages as productivity increased with mechanization, these increases to be demanded of the smaller companies whether mechanized or not. Royalty payments into the welfare fund were to be increased also, and the union was to have effective control over the fund's use. The union and large companies agreed upon other steps to exclude the marketing, production, and sale of nonunion coal. Thus the companies agreed not to lease coal lands to nonunion operators, and in 1958 agreed not to sell or buy coal from such companies. The companies and the union jointly and successfully approached the Secretary of Labor to obtain establishment under the Walsh-Healey Act, as amended, 49 Stat. 2036. 41 U. S. C. § 35 et seq. (1958 ed.). of a minimum wage for employees of contractors selling coal to the TVA, such minimum wage being much higher than in other industries and making it difficult for small companies to compete in the TVA term contract market. At a later time, at a meeting attended by both union and company representatives, the TVA was urged to curtail its spot market purchases, a substantial portion of which *661 were exempt from the Walsh-Healey order. Thereafter four of the larger companies waged a destructive and collusive price-cutting campaign in the TVA spot market for coal, two of the companies, West Kentucky Coal Co. and its subsidiary Nashville Coal Co., being those in which the union had large investments and over which it was in position to exercise control.
The complaint survived motions to dismiss and after a five-week trial before a jury, a verdict was returned in favor of Phillips and against the trustees and the union, the damages against the union being fixed in the amount of $90,000, to be trebled under 15 U. S. C. § 15 (1958 ed.). The trial court set aside the verdict against the trustees but overruled the union's motion for judgment notwithstanding the verdict or in the alternative for a new trial. The Court of Appeals affirmed. 325 F. 2d 804. It ruled that the union was not exempt from liability under the Sherman Act on the facts of this case, considered the instructions adequate and found the evidence generally sufficient to support the verdict. We granted certiorari. 377 U. S. 929. We reverse and remand the case for proceedings consistent with this opinion.

I.
We first consider UMW's contention that the trial court erred in denying its motion for a directed verdict and for judgment notwithstanding the verdict, since a determination in UMW's favor on this issue would finally resolve the controversy. The question presented by this phase of the case is whether in the circumstances of this case the union is exempt from liability under the antitrust laws. We think the answer is clearly in the negative and that the union's motions were correctly denied.
The antitrust laws do not bar the existence and operation of labor unions as such. Moreover, § 20 of the Clayton Act, 38 Stat. 738, and § 4 of the Norris-LaGuardia *662 Act, 47 Stat. 70, permit a union, acting alone to engage in the conduct therein specified without violating the Sherman Act. United States v. Hutcheson, 312 U. S. 219; United States v. International Hod Carriers Council, 313 U. S. 539, affirming per curiam, 37 F. Supp. 191 (D. C. N. D. Ill. 1941); United States v. American Federation of Musicians, 318 U. S. 741, affirming per curiam, 47 F. Supp. 304 (D. C. N. D. Ill. 1942).
But neither § 20 nor § 4 expressly deals with arrangements or agreements between unions and employers. Neither section tells us whether any or all such arrangements or agreements are barred or permitted by the antitrust laws. Thus Hutcheson itself stated:
"So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under § 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means." 312 U. S., at 232. (Emphasis added.)
And in Allen Bradley Co. v. Union, U. S. 797, this Court made explicit what had been merely a qualifying expression in Hutcheson and held that "when the unions participated with a combination of business men who had complete power to eliminate all competition among themselves and to prevent all competition from others, a situation was created not included within the exemptions of the Clayton and Norris-LaGuardia Acts." Id., at 809. See also Brotherhood of Carpenters v. United States, 330 U. S. 395, 398-400; United States v. Employing Plasterers Assn., 347 U. S. 186, 190. Subsequent cases have applied the Allen Bradley doctrine to such combinations without regard to whether they found expression in a collective bargaining agreement, Brother-hood *663 of Carpenters v. United States, supra; see Teamsters Union v. Oliver, 358 U. S. 283, 296, and even though the mechanism for effectuating the purpose of the combination was an agreement on wages, see Adams Dairy Co. v. St. Louis Dairy Co., 260 F. 2d 46 (C. A. 8th Cir. 1958), or on hours of work, Philadelphia Record Co. v. Manufacturing Photo-Engravers Assn., 155 F. 2d 799 (C. A. 3d Cir. 1946).
If the UMW in this case, in order to protect its wage scale by maintaining employer income, had presented a set of prices at which the mine operators would be required to sell their coal, the union and the employers who happened to agree could not successfully defend this contract provision if it were challenged under the antitrust laws by the United States or by some party injured by the arrangement. Cf. Allen Bradley Co. v. Union, 325 U. S. 797; United States v. Borden Co., 308 U. S. 188, 203-205; Lumber Prods. Assn. v. United States, 144 F. 2d 546, 548 (C. A. 9th Cir. 1944), aff'd on this issue sub nom. Brotherhood of Carpenters v. United States, 330 U. S. 395, 398-400; Las Vegas Merchant Plumbers Assn. v. United States, 210 F. 2d 732 (C. A. 9th Cir. 1954), cert. denied, 348 U. S. 817; Local 175, IBEW v. United States, 219 F. 2d 431 (C. A. 6th Cir. 1955), cert. denied, 349 U. S. 917. In such a case, the restraint on the product market is direct and immediate, is of the type characteristically deemed unreasonable under the Sherman Act and the union gets from the promise nothing more concrete than a hope for better wages to come.
Likewise, if as is alleged in this case, the union became a party to a collusive bidding arrangement designed to drive Phillips and others from the TVA spot market, we think any claim to exemption from antitrust liability would be frivolous at best. For this reason alone the motions of the unions were properly denied.
*664 A major part of Phillips' case, however, was that the union entered into a conspiracy with the large operators to impose the agreed-upon wage and royalty scales upon the smaller, nonunion operators, regardless of their ability to pay and regardless of whether or not the union represented the employees of these companies, all for the purpose of eliminating them from the industry, limiting production and pre-empting the market for the large, unionized operators. The UMW urges that since such an agreement concerned wage standards, it is exempt from the antitrust laws.
It is true that wages lie at the very heart of those subjects about which employers and unions must bargain and the law contemplates agreements on wages not only between individual employers and a union but agreements between the union and employers in a multi-employer bargaining unit. Labor Board v. Truck Drivers Union, 353 U. S. 87, 94-96. The union benefit from the wage scale agreed upon is direct and concrete and the effect on the product market, though clearly present, results from the elimination of competition based on wages among the employers in the bargaining unit, which is not the kind of restraint Congress intended the Sherman Act to proscribe. Apex Hosiery Co. v. Leader, 310 U. S. 469, 503-504; see Adams Dairy Co. v. St. Louis Dairy Co., 260 F. 2d 46 (C. A. 8th Cir. 1958). We think it beyond question that a union may conclude a wage agreement with the multi-employer bargaining unit without violating the antitrust laws and that it may as a matter of its own policy, and not by agreement with all or part of the employers of that unit, seek the same wages from other employers.
This is not to say that an agreement resulting from union-employer negotiations is automatically exempt from Sherman Act scrutiny simply because the negotiations involve a compulsory subject of bargaining, regardless *665 of the subject or the form and content of the agreement. Unquestionably the Board's demarcation of the bounds of the duty to bargain has great relevance to any consideration of the sweep of labor's antitrust immunity, for we are concerned here with harmonizing the Sherman Act with the national policy expressed in the National Labor Relations Act of promoting "the peaceful settlement of industrial disputes by subjecting labor-management controversies to the mediatory influence of negotiation," Fibreboard Paper Prods. Corp. v. Labor Board, 379 U. S. 203, 211. But there are limits to what a union or an employer may offer or extract in the name of wages, and because they must bargain does not mean that the agreement reached may disregard other laws. Teamsters Union v. Oliver, 358 U. S. 283, 296; Brotherhood of Carpenters v. United States, 330 U. S. 395, 399-400.
We have said that a union may make wage agreements with a multi-employer bargaining unit and may in pursuance of its own union interests seek to obtain the same terms from other employers. No case under the antitrust laws could be made out on evidence limited to such union behavior.[2] But we think a union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units. One group of employers may not conspire to eliminate competitors from *666 the industry and the union is liable with the employers if it becomes a party to the conspiracy. This is true even though the union's part in the scheme is an undertaking to secure the same wages, hours or other conditions of employment from the remaining employers in the industry.
We do not find anything in the national labor policy that conflicts with this conclusion. This Court has recognized that a legitimate aim of any national labor organization is to obtain uniformity of labor standards and that a consequence of such union activity may be to eliminate competition based on differences in such standards. Apex Hosiery Co. v. Leader, 310 U. S. 469, 503. But there is nothing in the labor policy indicating that the union and the employers in one bargaining unit are free to bargain about the wages, hours and working conditions of other bargaining units or to attempt to settle these matters for the entire industry. On the contrary, the duty to bargain unit by unit leads to a quite different conclusion. The union's obligation to its members would seem best served if the union retained the ability to respond to each bargaining situation as the individual circumstances might warrant, without being strait-jacketed by some prior agreement with the favored employers.
So far as the employer is concerned it has long been the Board's view that an employer may not condition the signing of a collective bargaining agreement on the union's organization of a majority of the industry. American Range Lines, Inc., 13 N. L. R. B. 139, 147 (1939); Samuel Youlin, 22 N. L. R. B. 879, 885 (1940); Newton Chevrolet, Inc., 37 N. L. R. B. 334, 341 (1941); see Labor Board v. George P. Pilling & Son Co., 119 F. 2d 32, 38 (C. A. 3d Cir. 1941). In such cases the obvious interest of the employer is to ensure that acceptance of the union's wage demands will not adversely affect his competitive position. In American Range Lines, Inc., supra, the *667 Board rejected that employer interest as a justification for the demand. "[A]n employer cannot lawfully deny his employees the right to bargain collectively through their designated representative in an appropriate unit because he envisions competitive disadvantages accruing from such bargaining." 13 N. L. R. B., at 147. Such an employer condition, if upheld, would clearly reduce the extent of collective bargaining. Thus, in Newton Chevrolet Inc., supra, where it was held a refusal to bargain for the employer to insist on a provision that the agreed contract terms would not become effective until five competitors had signed substantially similar contracts, the Board stated that "[t]here is nothing in the Act to justify the imposition of a duty upon an exclusive bargaining representative to secure an agreement from a majority of an employer's competitors as a condition precedent to the negotiation of an agreement with the employer. To permit individual employers to refuse to bargain collectively until some or all of their competitors had done so clearly would lead to frustration of the fundamental purpose of the Act to encourage the practice of collective bargaining." 37 N. L. R. B., at 341. Permitting insistence on an agreement by the union to attempt to impose a similar contract on other employers would likewise seem to impose a restraining influence on the extent of collective bargaining, for the union could avoid an impasse only by surrendering its freedom to act in its own interest vis-a-vis other employers, something it will be unwilling to do in many instances. Once again, the employer's interest is a competitive interest rather than an interest in regulating its own labor relations, and the effect on the union of such an agreement would be to limit the free exercise of the employees' right to engage in concerted activities according to their own views of their self-interest. In sum, we cannot conclude that the national labor policy provides any support for such agreements.
*668 On the other hand, the policy of the antitrust laws is clearly set against employer-union agreements seeking to prescribe labor standards outside the bargaining unit. One could hardly contend, for example, that one group of employers could lawfully demand that the union impose on other employers wages that were significantly higher than those paid by the requesting employers, or a system of computing wages that, because of differences in methods of production, would be more costly to one set of employers than to another. The anticompetitive potential of such a combination is obvious, but is little more severe than what is alleged to have been the purpose and effect of the conspiracy in this case to establish wages at a level that marginal producers could not pay so that they would be driven from the industry. And if the conspiracy presently under attack were declared exempt it would hardly be possible to deny exemption to such avowedly discriminatory schemes.
From the viewpoint of antitrust policy, moreover, all such agreements between a group of employers and a union that the union will seek specified labor standards outside the bargaining unit suffer from a more basic defect, without regard to predatory intention or effect in the particular case. For the salient characteristic of such agreements is that the union surrenders its freedom of action with respect to its bargaining policy. Prior to the agreement the union might seek uniform standards in its own self-interest but would be required to assess in each case the probable costs and gains of a strike or other collective action to that end and thus might conclude that the objective of uniform standards should temporarily give way. After the agreement the union's interest would be bound in each case to that of the favored employer group. It is just such restraints upon the freedom of economic units to act according to their own choice and discretion that run counter to antitrust policy. See, e. g., Associated *669 Press v. United States, 326 U. S. 1, 19; Fashion Griginators' Guild v. Federal Trade Comm'n, 312 U. S. 457, 465; Anderson v. Shipowners Assn., 272 U. S. 359, 364-365.
Thus the relevant labor and antitrust policies compel us to conclude that the alleged agreement between UMW and the large operators to secure uniform labor standards throughout the industry, if proved, was not exempt from the antitrust laws.

II.
The UMW next contends that the trial court erroneously denied its motion for a new trial based on claimed errors in the admission of evidence.
In Eastern R. Conf. v. Noerr Motors, 365 U. S. 127, the Court rejected an attempt to base a Sherman Act conspiracy on evidence consisting entirely of activities of competitors seeking to influence public officials. The Sherman Act, it was held, was not intended to bar concerted action of this kind even though the resulting official action damaged other competitors at whom the campaign was aimed. Furthermore, the legality of the conduct "was not at all affected by any anticompetitive purpose it may have had," id., at 140even though the "sole purpose in seeking to influence the passage and enforcement of laws was to destroy the truckers as competitors for the long-distance freight business," id., at 138. Nothing could be clearer from the Court's opinion than that anticompetitive purpose did not illegalize the conduct there involved.
We agree with the UMW that both the Court of Appeals and the trial court failed to take proper account of the Noerr case. In approving the instructions of the trial court with regard to the approaches of the union and the operators to the Secretary of Labor and to the TVA officials, the Court of Appeals considered Noerr as applying only to conduct "unaccompanied by a purpose or intent to further a conspiracy to violate a statute. It is *670 the illegal purpose or intent inherent in the conduct which vitiates the conduct which would otherwise be legal." 325 F. 2d, at 817. Noerr shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose. The Court of Appeals, however, would hold the conduct illegal depending upon proof of an illegal purpose.
The instructions of the trial court to the jury exhibit a similar infirmity. The jury was instructed that the approach to the Secretary of Labor was legal unless part of a conspiracy to drive small operators out of business and that the approach to the TVA was not a violation of the antitrust laws "unless the parties so urged the TVA to modify its policies in buying coal for the purpose of driving the small operators out of business." If, therefore, the jury determined the requisite anticompetitive purpose to be present, it was free to find an illegal conspiracy based solely on the Walsh-Healey and TVA episodes, or in any event to attribute illegality to these acts as part of a general plan to eliminate Phillips and other operators similarly situated. Neither finding, however, is permitted by Noerr for the reasons stated in that case. Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act. The jury should have been so instructed and, given the obviously telling nature of this evidence, we cannot hold this lapse to be mere harmless error.[3]
*671 There is another reason for remanding this case for further proceedings in the lower courts. It is clear under Noerr that Phillips could not collect any damages under the Sherman Act for any injury which it suffered from the action of the Secretary of Labor. The conduct of the union and the operators did not violate the Act, the action taken to set a minimum wage for government purchases of coal was the act of a public official who is not claimed to be a co-conspirator and the jury should have been instructed, as UMW requested, to exclude any damages which Phillips may have suffered as a result of the Secretary's Walsh-Healey determinations.[4] See also American Banana Co. v. United Fruit Co., 213 U. S. 347, 358; Angle v. Chicago, St. Paul, Minneapolis & Omaha R. Co., 151 U. S. 1, 16-21; Okefenokee Rural Elec. Mem. Corp. v. Florida P. & L. Co., 214 F. 2d 413, 418 (C. A. 5th Cir. 1954). The trial court, however, admitted evidence *672 concerning the Walsh-Healey episodes for "whatever bearing it may have on the overall picture" and told the jury in its final instructions to include in the verdict all damages resulting directly from any act which was found to be part of the conspiracy. The effect this may have had on the jury is reflected by the statement of the Court of Appeals that the jury could reasonably conclude "that the wage determination for the coal industry under the Walsh-Healey Act and the dumping of West Kentucky coal on the TVA spot market materially and adversely affected the operations of Phillips in the important TVA market . . . ," 325 F. 2d, at 815, and that "[t]his minimum wage determination prevented Phillips from bidding on the TVA term market . . . ." id., at 814.[5]
The judgment is reversed and the case remanded for further proceedings consistent with this opinion.
It is so ordered.
[For opinion of MR. JUSTICE GOLDBERG dissenting from the opinion but concurring in the reversal, see post, p. 697.]
MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK and MR. JUSTICE CLARK agree, concurring.
As we read the opinion of the Court, it reaffirms the principles of Allen Bradley Co. v. Union, 325 U. S. 797, and tells the trial judge:
First. On the new trial the jury should be instructed that if there were an industry-wide collective bargaining agreement whereby employers and the union agreed on a *673 wage scale that exceeded the financial ability of some operators to pay and that if it was made for the purpose of forcing some employers out of business, the union as well as the employers who participated in the arrangement with the union should be found to have violated the antitrust laws.
Second. An industry-wide agreement containing those features is prima facie evidence of a violation.[*]
In Allen Bradley Co. v. Union, supra, the union was promoting closed shops in the New York City area. It got contractors to purchase equipment only from local manufacturers who had closed-shop agreements with the union; and it got manufacturers to confine their New York City sales to contractors employing the union's members. Agencies were set up to boycott recalcitrant local contractors and manufacturers and bar from the area equipment manufactured outside its boundaries. As we said:
"The combination among the three groups, union, contractors, and manufacturers, became highly successful from the standpoint of all of them. The business of New York City manufacturers had a phenomenal growth, thereby multiplying the jobs available for the Local's members. Wages went up, hours were shortened, and the New York electrical equipment *674 prices scared, to the decided financial profit of local contractors and manufacturers." 325 U. S., at 800.
I repeat what we said in Allen Bradley Co. v. Union, supra, at 811:
"The difficulty of drawing legislation primarily aimed at trusts and monopolies so that it could also be applied to labor organizations without impairing the collective bargaining and related rights of those organizations has been emphasized both by congressional and judicial attempts to draw lines between permissible and prohibited union activities. There is, however, one line which we can draw with assurance that we follow the congressional purpose. We know that Congress feared the concentrated power of business organizations to dominate markets and prices. It intended to outlaw business monopolies. A business monopoly is no less such because a union participates, and such participation is a violation of the [Sherman] Act."
Congress can design an oligopoly for our society, if it chooses. But business alone cannot do so as long as the antitrust laws are enforced. Nor should business and labor working hand-in-hand be allowed to make that basic change in the design of our so-called free enterprise system. If the allegations in this case are to be believed, organized labor joined hands with organized business to drive marginal operators out of existence. According to those allegations the union used its control over West Kentucky Coal Co. and Nashville Coal Co. to dump coal at such low prices that respondents, who were small operators, had to abandon their business. According to those allegations there was a boycott by the union and the major companies against small companies who needed major companies' coal land on which to operate. According *675 to those allegations high wage and welfare terms of employment were imposed on the small, marginal companies by the union and the major companies with the knowledge and intent that the small ones would be driven out of business.
The only architect of our economic system is Congress. We are right in adhering to its philosophy of the free enterprise system as expressed in the antitrust laws and as enforced by Allen Bradley Co. v. Union, supra, until the Congress delegates to big business and big labor the power to remold our economy in the manner charged here.
NOTES
[1] The parties stipulated that the damages period would include the four-year limitation period, 15 U. S. C. § 15b (1958 ed.), preceding the filing of Phillips' cross claim and extend up to December 31, 1958, the date on which Phillips terminated its business.
[2] Unilaterally, and without agreement with any employer group to do so, a union may adopt a uniform wage policy and seek vigorously to implement it even though it may suspect that some employers cannot effectively compete if they are required to pay the wage scale demanded by the union. The union need not gear its wage demands to wages which the weakest units in the industry can afford to pay. Such union conduct is not alone sufficient evidence to maintain a union-employer conspiracy charge under the Sherman Act. There must be additional direct or indirect evidence of the conspiracy. There was, of course, other evidence in this case, but we indicate no opinion as to its sufficiency.
[3] It would of course still be within the province of the trial judge to admit this evidence, if he deemed it probative and not unduly prejudicial, under the "established judicial rule of evidence that testimony of prior or subsequent transactions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny. Standard Oil Co. v. United States, 221 U. S. 1, 46-47; United States v. Reading Co., 253 U. S. 26, 43-44." Federal Trade Comm'n v. Cement Institute, 333 U. S. 683, 705; see also Heike v. United States, 227 U. S. 131, 145; American Medical Assn. v. United States, 76 U. S. App. D. C. 70, 87-89, 130 F. 2d 233, 250-252 (1942), aff'd, 317 U. S. 519 (certiorari limited to other issues).
[4] By contrast, in Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U. S. 690, we held that the acts of a wartime purchasing agent appointed by the Canadian Government could be proved as part of the conspiracy and as an element in computing damages. The purchasing agent, however, was not a public official but the wholly owned subsidiary of an American corporation alleged to be a principal actor in the conspiracy. The acts complained of had been performed at the direction of the purchasing agent's American parent and there was "no indication that the Controller or any other official within the structure of the Canadian Government approved or would have approved of joint efforts to monopolize the production and sale of vanadium or directed that purchases from [the plaintiff] be stopped." 370 U. S., at 706. That case is wholly dissimilar to both Noerr and the present case.
[5] This latter conclusion regarding the term market would seem doubly erroneous as Phillips had virtually conceded, in the course of offering evidence respecting bids of the alleged conspirators on the term market, that it was claiming no damages from its exclusion from the term market, a market it never had any immediate prospect of entering. The trial court ruled that the proffered testimony was inadmissible on the damages phase of the case.
[*] "It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators. Schenck v. United States, 253 F. 212, 213, aff'd, 249 U. S. 47; Levey v. United States, 92 F. 2d 688, 691. Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act. Eastern States Lumber Assn. v. United States, 234 U. S. 600; Lawlor v. Loewe, 235 U. S. 522, 534; American Column Co. v. United States, 257 U. S. 377; United States v. American Linseed Oil Co., 262 U. S. 371." Interstate Circuit v. United States, 306 U. S. 208, 227.