**GRANDDAD BREAD, INC., a corporation, Plaintiff-Appellant,**

v.

**CONTINENTAL BAKING CO., a corporation, Defendant-Appellee.**

No. 78–3698.

United States Court of Appeals, Ninth Circuit.

Nov. 23, 1979.

Rehearing Denied Feb. 21, 1980.

---

3. The instant conviction was Goodwin's second narcotics conviction in four years.

Charles R. Lonergan, Jr., Seattle, Wash., argued for plaintiff-appellant; Raymond H. Siderius, Siderius, Lonergan & Crowley, Seattle, Wash., on the brief.

E. Edward Bruce, Washington, D. C., argued for defendant-appellee; Nancy P. Gibbs, Seattle, Wash., on the brief.

Before HUFSTEDLER and ANDERSON, Circuit Judges, and GRANT,* District Judge.

* The Honorable Robert A. Grant, Senior United States District Judge, Northern District of Indiana, sitting by designation.

**J. BLAINE ANDERSON, Circuit Judge:**

This antitrust case involves an appeal by Granddad Bread, Inc., (Granddad) from judgment n. o. v. in favor of Continental Baking Company (Continental). The court below found that Continental's activities were, in part, protected by the labor exemption to the antitrust laws, and that there was insufficient evidence to support liability under the other conspiracy theories. We agree and affirm the judgment of the district court.

## I. PROCEEDINGS BELOW

Granddad, the plaintiff, originally brought this action against Continental and five other defendants, alleging conspiracy, monopolization, attempted monopolization, and price discrimination in the Seattle wholesale bread market. The other named defendants were Teamsters International Union of Bakery Salesmen, Local 227 (Local 227); Ashbrook Bakeries Corporation of Seattle (Ashbrook); Safeway Stores, Incorporated; American Bakeries Company; and Hansen Baking Company, Inc. All of the other defendants, except for Continental, settled with Granddad prior to trial.

After a nine-day trial, on February 19, 1975, a jury returned a special verdict against Continental. The jury found that Continental had not monopolized or attempted to monopolize any part of interstate trade in violation of Section 2 of the Sherman Act. But the jury did find that Continental had engaged in a conspiracy with the original defendants in an unreasonable restraint of, and in an attempt to monopolize, interstate trade (Sherman Act Sections One and Two). The jury also found that Continental had engaged in price discrimination in violation of the Robinson-Patman Act.

After the adverse verdict, Continental moved for judgment n. o. v. and the district court granted it on the Robinson-Patman claim, but denied it on the Sherman Act conspiracy claims. Continental then took an appeal from the denial of its motion. Granddad never appealed from the Robinson-Patman ruling.

On December 14, 1977, a panel of this court entered an order remanding the case to the district court for reconsideration in view of the recent decisions involving the scope of the labor exemption to the antitrust laws. On remand, the court below entered an order granting Continental's motion for judgment n. o. v. based on *Connell Construction Co. v. Plumbers & Steamfitters,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), and *California Dump Truck v. Associated General Contractors,* 562 F.2d 607 (9th Cir. 1977). The district court concluded that the jury should not have been allowed to consider the labor-related aspects of the case, and, aside from the matters protected by the labor exemption, there was insufficient evidence to support antitrust liability. Granddad then brought this appeal.[1]

## II. BACKGROUND

Traditionally, the bread produced by the major Seattle wholesale bakers was delivered by driver salesmen who were members of Local 227, and employees of the respective bakers. They were paid a salary plus a commission for the bread sold. They picked up the bread from the wholesale bakers and provided rack service[2] at the retail stores.

In 1960, one of the Seattle wholesale bakers, Ashbrook, began to sell its bread to a retail outlet pursuant to an agreement where the retail outlet had its own drivers (as opposed to members of Local 227) pick up and deliver the bread.

This incident became the focal point of negotiations when the collective bargaining agreement between Local 227 and the bakers came up for renegotiation in 1962. Local 227 insisted upon obtaining a provi-

---

1. The district court had jurisdiction pursuant to 28 U.S.C. § 1337. This court has jurisdiction under 28 U.S.C. § 1291.

2. This means that the driver actually brought the bread into the retail stores, displayed it on the grocer's shelves, and picked up the stale bread which had not sold.

sion which would prohibit any of the signatory bakers from using a delivery method which did not utilize Local 227 driver salesmen servicing the racks at the retail stores.

The bakers eventually agreed to the demands of Local 227. Article IV of the collective bargaining agreement prohibited the signatory bakers from having anyone else pick up and deliver their products to retailers, except for members of Local 227 who were to continue providing rack service at the retail outlets.[3]

Granddad's predecessor came into existence in 1963. Granddad was never a party to the collective bargaining agreement with Local 227. Granddad was not a baker, but was instead only a distributor which had to purchase its products from the wholesale bakers.

Granddad initially purchased its bread from Ashbrook. However, in 1964, Ashbrook refused to sell any more bread to Granddad unless Granddad terminated its wholesale selling to retail outlets and confined its sales to residences.

Unable to find another quality wholesale baker who would sell bread to them in the Seattle area for resale to retailers, Granddad found a baker in Canada. Thereafter, Granddad relied upon the Canadian baker as its source of supply.

---

**3.** Article IV of the 1962 collective bargaining agreement provided as follows:

*Section 1.* No employer, prior to the termination of this agreement, shall change its method of distribution in effect at its particular establishment on May 1, 1962.

(A) There shall be no dock pickup, dock delivery or dock shipment (as hereinafter defined) except as were in effect at the particular employer's establishment on May 1, 1962.

*Section 2.* Dock Pickup, Dock Delivery and Dock Shipment. As used in this Agreement:

(A) Dock pickup means a customer of an Employer signatory to this Agreement taking delivery of bakery products at the dock of such Employer.

(B) Dock delivery means an Employer signatory to this Agreement delivering bakery products by leaving them at the dock of the customer.

(C) Dock shipment means an Employer signatory to this Agreement delivering bakery products by common carrier or contract carrier.

(D) While this Agreement does not undertake to regulate the volume of business done by each Employer with any of its existing customers, it is specifically agreed that each employer shall refrain from entering into any agreement or arrangement of any kind with any new or existing customer which shall result in the use of dock delivery, dock pickup or dock shipment of any bakery products; provided, however, any agreement in effect on May 1, 1962, which results in the use of dock delivery, dock pickup or dock shipment may be renewed.

*Section 3.* The Employer hereby recognizes the previously established past practice of members of Local Union No. 227 displaying the bakery products in retail establishments. All such methods of displaying merchandise shall continue in the future as they have in the past. Any dispute as to such procedure shall be subjected to the Grievance Procedure as established herein.

*Section 4.* There shall be no deliveries on a Sunday, Holiday, or on such other days on which regular deliveries are not made, except deliveries to boats or trains for out-of-city delivery, deliveries to box lunch companies, or emergencies. All such deliveries shall be made by members of the bargaining unit who are employees of Employers signatory to this Agreement. No person shall procure or haul bakery products from bakeries for resale on Sundays or Holidays or on such other days on which regular deliveries are not made.

*Section 5.* In the event of an emergency the Employer shall first telephone a representative of the Union for approval. If a representative of the Union cannot be reached by telephone, prior approval shall not be necessary but the Employer shall record the time when he tried to telephone such representative and shall inform the Union Representative the next business day of the nature of the emergency and the time of his telephone call to the Union Representative.

*Section 6.* No salesman allowed to start delivery of bakery goods before five (5) o'clock a. m., and must be off the streets by four (4) o'clock p. m. Salesman's time to start when he begins loading. There shall be no loading before four (4) o'clock a. m. No salesman shall be allowed to wash or repair machines on Sundays.

*Section 7.* No Employer shall load or permit the loading of any truck irrespective of whether such employer owns the truck or not which shall leave the loading area prior to 4:30 a. m., to make retail or restaurant deliveries.

During the damage period of 1967 to 1971, Granddad continued its distribution of bread to retail outlets. According to Granddad, the various defendants engaged in various predatory practices during this period for the purpose of driving Granddad out of business.

### III. *QUESTIONS PRESENTED*

Granddad raises two principal issues on appeal. The first is whether Continental's participation in the formation or application of Article IV of the collective bargaining agreement came within the labor exemption to the antitrust laws. And the second question, apart from the labor evidence in the case, is whether there was sufficient evidence to support the jury's verdict that Continental had engaged in a combination or a conspiracy, either to monopolize or in restraint of trade.

### IV. *STANDARD OF REVIEW*

■ There is a general policy disfavoring summary procedures in antitrust litigation because of the important role which motive and intent play in determining liability. *Poller v. Columbia Broadcasting,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). Nevertheless, this policy only applies to pretrial motions, not to post-trial motions such as the judgment n. o. v. which is involved in the present case. *Cal. Computer Products v. Intern. Business Machines,* 613 F.2d 727, at 734 (9th Cir. 1979).

■ On appeal from a judgment n. o. v., this court must view the evidence in the light most favorable to the party against whom the motion is made. *Wescott v.*

*Impresas Armadoras,* 564 F.2d 875 (9th Cir. 1977). A judgment n. o. v. should be granted only when the evidence permits one reasonable conclusion as to the verdict. *Fountila v. Carter,* 571 F.2d 487, 489–490 (9th Cir. 1978).

In order to benefit from the favorable inferences, the non-moving party must present substantial evidence to support its claim. *California Computer,* at 733. This is defined as "evidence as a reasonable mind might accept as adequate to support a conclusion." *California Computer,* at 734.

Our task on this appeal is the same as it was for the district judge, to determine whether there was "substantial evidence" in the record to support Granddad's antitrust claims.

### V. *THE LABOR EXEMPTION*

■ Generally, organized labor has two types of exemptions from the antitrust laws: statutory and non-statutory. *Dump Truck, supra,* 562 F.2d at 610. The statutory exemption is derived from the Clayton and the Norris-LaGuardia Acts where "specific union activities, including secondary picketing and boycotts, [are excepted] from the operation of the antitrust laws." *Connell Construction, supra,* 421 U.S. at 621–622, 95 S.Ct. at 1835. This does not apply to concerted action or agreements between unions and non-labor parties. *Id.* The non-statutory exemption, which is more limited in scope, then comes into play. *Id.* The source of the non-statutory exemption is "the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions."[4] *Id.*

4. The philosophy behind this was explained more fully in *Connell, supra,* where the Court said:

"The nonstatutory exemption has its source in the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions. Union success in organizing workers and standardizing wages ultimately will affect price competition among employers, but the goals of federal labor law never could be achieved if this effect on business competition were held a violation of the antitrust laws. The Court therefore has acknowledged that labor policy requires tolerance for the lessening of business competition based on differences in wages and working conditions. Labor policy clearly does not require, however, that a union have freedom to impose direct restraints on competition among those who employ its members. Thus, while the statutory exemption allows unions to accomplish some restraints by acting unilaterally, the nonstatutory exemption offers no similar protection when a union and a nonlabor party agree to restrain competition in a business market." (citations omitted)

421 U.S. at 622–623, 95 S.Ct. at 1835.

at 622, 95 S.Ct. at 1835. It is the non-statutory exemption which is involved in the present case.

Granddad argues that Article IV of the collective bargaining agreement was "illegal and void" under the National Labor Relations Act. Therefore, according to Granddad, Continental cannot benefit from the protection of the labor exemption. Moreover, Granddad contends that the jury properly resolved this question and its verdict should not have been questioned.

■ The court below found that Article IV of the collective bargaining agreement was a valid work preservation clause and that the jury should not have been allowed to consider it as a basis for imposing antitrust liability against Continental. We agree.

Pursuant to Section 8(e) of the National Labor Relations Act, a contract or agreement between any labor organization and any employer under which the employer agrees to refrain from doing business with any other person is an unfair labor practice.[5] 29 U.S.C. § 158(e). Despite the sweeping language of Section 8(e), the Supreme Court has held that primary work preservation clauses do not fall within the broad prohibition. *Woodwork Manufacturers v. NLRB,* 386 U.S. 612, 639, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).

■ The determination as to whether an agreement is *primarily* for work preservation depends upon whether it was entered into, or applied, for the purpose of preserving work traditionally performed by the union members or for some secondary purpose to satisfy union objectives elsewhere. *NLRB v. Pipefitters,* 429 U.S. 507, 511, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977).

It is clear that Article IV was entered into for the purpose of preserving Local 227's jobs. In the Seattle area, members of Local 227 had traditionally picked up the bread from the wholesale bakers and delivered it to the retail establishments. They had traditionally serviced the retailer's bread racks for which they received extra compensation.

In 1960, one of the Seattle bakeries, Ashbrook, began selling to Associated Grocers and allowing Associated Grocers to send their own drivers to pick up the baked goods. As a result, this became a crucial issue when the collective bargaining agreement came up for renegotiation (between Local 227 and the wholesale bakers) in 1962. Local 227 realized that if the other bakeries adopted similar methods of distribution, then there would be substantial losses of union jobs and memberships. The bakers only agreed to Article IV after it became apparent that it was a strike issue to the members of Local 227.

**5.** The full text of this section provides as follows:

"(e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: *Provided,* That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: *Provided further,* That for the purposes of this subsection and subsection (b)(4)(B) of this section the terms "any employer", "any person engaged in commerce or an industry affecting commerce", and "any person" when used in relation to the terms "any other producer, processor, or manufacturer", "any other employer", or "any other person" shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: *Provided further,* That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception."

Nevertheless, Granddad argues that the purpose behind Article IV was to injure or limit the business of others who were not signators of the agreement (an illegal secondary purpose). This contention is supported by neither the terms of the agreement nor the facts. Article IV contained a grandfather clause so that any baker which was then using a non-Local 227 delivery method (i. e., Ashbrook) could continue. Additionally, Granddad could not have been within the contemplation of the parties since it was not in existence at the time that Article IV was made a part of the collective bargaining agreement.

Contrary to Granddad's assertions, there was no evidence which could support a finding that Article IV involved prohibited secondary activity, either in its original intendment or in its application. The preservation of union jobs was a matter properly considered in the collective bargaining agreement. The bakers had the right to control the methods by which their products were delivered to retailers. *See Chamber of Commerce of U. S., etc. v. N. L. R. B.,* 574 F.2d 457, 462 (9th Cir. 1978). As Granddad admits, Local 227 never used Article IV in an attempt to organize Granddad's employees. *See Connell, supra,* 421 U.S. at 626, 95 S.Ct. 1830.

Granddad also argues that the district court correctly instructed the jury on the labor issue and that the findings of the jury should be final. Granddad, however, failed to introduce sufficient evidence to justify submitting the issue to the jury. The primary evidence before the jury was Article IV which was a valid work preservation clause in a collective bargaining agreement. There was also evidence showing that the parties to the agreement had abided by its terms. There was no evidence that the bakers or Local 227 had either entered into Article IV or used it to control the wholesale bread market or to injure competitors. The isolated instances of activity by the representatives from Local 227 are not sufficient to predicate a claim of antitrust liability against Continental. The jury

should not have been allowed to consider the labor-related aspects of this case.

Article IV simply does not have the same type of direct and immediate effect on competition in a product market similar to those cases where the labor exemption has been found inapplicable. *See, e. g., Connell, supra,* 421 U.S. at 623–626, 95 S.Ct. 1830; *United Mine Workers v. Pennington,* 381 U.S. 657, 666–669, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

## VI. *COMBINATION OR CONSPIRACY*

■■ We must also consider the non-labor-related aspects of this case. The jury found that Continental had engaged in contract, combination or conspiracy, in unreasonable restraint of trade (aside from Article IV), in violation of Sherman Act Section One. Additionally, the jury found that Continental had engaged in a combination or conspiracy to monopolize trade in violation of Sherman Act Section Two. The court below found that the jury's consideration of the labor aspects of the case affected its determination of these issues. In granting judgment n. o. v., the district court held that "there was no evidence of any agreement between Continental and the Teamsters [Local 227] or any other alleged co-conspirators which could have damaged Granddad in the manner complained of in this action." We agree that Granddad failed to produce sufficient evidence to support the jury's finding that Continental had conspired or combined with any of the other wholesale bakers.

As noted earlier, the jury rejected Granddad's single firm theory of attempt to monopolize under Section Two, but it did return a verdict in Granddad's favor on the allegation of a combination or conspiracy to monopolize under Section Two. Although the essential elements of a Section One offense are substantially different than for a Section Two offense, when a combination or conspiracy is charged under Section Two, then a prima facie case under either section has the same prerequisite, that is, a show-

ing of concerted action by the defendants.[6] Granddad failed to produce sufficient evidence which could support a finding that Continental combined or conspired with any of the other wholesale bakers. *Cf. Hallmark Industry v. Reynolds Metal Company*, 489 F.2d 8, 13–14 (9th Cir. 1973).

Granddad claims that various instances of parallel behavior by Continental and the other wholesale bakers is sufficient evidence from which an agreement can be inferred. Continental and the other wholesale bakers maintained a two-tiered wholesale price structure, pricing "premium" loaves at an artificially high level and selling the secondary and private-labeled loaves at a much lower price. The court below found that uncontradicted testimony at trial explained the development of this merchandising technique and how it was unrelated to any alleged conspiracy against Granddad. Granddad also claims that there was destructive price war which resulted in a virtual simultaneous price increase in 1969. The district court found that Granddad did not introduce any evidence that Continental had charged unreasonably low prices, nor was there any evidence of the wholesale prices charged by other bakers or any agreement between the wholesale bakers. Granddad contends that it did offer evidence of the prices charged by the other bakers. Accepting Granddad's representations, we still cannot find sufficient evidence from which a jury could properly infer concerted activity which is within the reach of the Sherman Act. At best, Granddad was only able to show parallel action; this is not enough to establish any type of agreement. *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 84–85 (9th Cir. 1969).

## VII.  *CONCLUSION*

In light of Granddad's failure to present substantial evidence supporting its claim,

we conclude that the district court properly granted Continental's motion for judgment n. o. v.

AFFIRMED.

---

6.  Since there is no indication that the words "combination" or "conspiracy" under Section One are distinguishable from the words "combine" or "conspire" under Section Two, we treat them as stating an identical requirement for the purposes of our discussion. See 2 von Kalinowski, Antitrust Laws and Trade Regulation (1979) 9–31—9–32 n.18.