**SUN–LAND NURSERIES, INC., a California corporation, Plaintiff-Appellant,**

v.

**SOUTHERN CALIFORNIA DISTRICT COUNCIL OF LABORERS, et al., Defendants-Appellees.**

No. 85–6029.

United States Court of Appeals, Ninth Circuit.

Argued June 7, 1985.

Submitted July 8, 1985.

Decided Aug. 27, 1985.

**1382**

Van A. Goodwin, Littler, Mendelson, Fastiff & Tichy, San Diego, Cal., for plaintiff-appellant.

Julius Reich & Alexander B. Cvitan, Reich, Adell & Crost Los Angeles, Cal., for defendants-appellees.

Before WALLACE, TANG, and WIGGINS, Circuit Judges.

WALLACE, Circuit Judge:

Sun-Land Nurseries, Inc. (Sun-Land) appeals from the district court's judgment that certain hot cargo agreements fall within the construction industry proviso to section 8(e) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(e), and that therefore those agreements are automatically exempt from antitrust scrutiny under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. We have jurisdiction under 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand.

**I**

Sun-Land is a landscaping company to which general contractors may subcontract work on major construction projects. The present dispute arose after the Teamsters Local 420 (Teamsters) terminated its representation of Sun-Land's employees either because of an internal power struggle or in the hope of improving its relations with the Southern California District Council of Laborers (Laborers). *Toyota Landscape Co. v. Building Material & Dump Truck Drivers Local No. 420*, 726 F.2d 525, 527, 529 (9th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 104, 83 L.Ed.2d 49 (1984) (*Toyota*). Sun-Land brought suit against the Teamsters, and we ultimately held that the termination constituted a violation of the collective bargaining agreement between the Teamsters and Sun-Land. *Id.* at 529. In the meantime, however, Sun-Land's employees elected the Independent Union of Craftsmen (Independent Union) as their new bargaining representative.

Unfortunately for Sun-Land, many of the general contractors in the area in which it does business are parties to various multi-employer agreements that prohibit the subcontracting of work to any employer that does not have a current bargaining agreement with the Laborers or one of the basic craft unions specifically named in the agreements (the Major Unions). Sun-Land claims that, as a result of these subcontracting limitation clauses and its lack of affiliation with either the Laborers or any of the Major Unions, its business suffered drastically. It therefore brought suit against the Laborers arguing that the subcontracting clauses constitute both an unfair labor practice under section 8(e) of the NLRA, 29 U.S.C. § 158(e), and an unreasonable restraint on trade under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

The district court granted summary judgment in favor of the Laborers, holding that under the construction industry proviso, the challenged clauses are exempt from section 8(e)'s prohibition against hot cargo agreements and that therefore they are

automatically exempt from Sherman Act scrutiny. The district judge rejected Sun-Land's attempts to distinguish *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982) (*Woelke*), and reasoned that *Woelke* compelled his section 8(e) holding. The district judge relied on *Suburban Tile Center v. Rockford Building Trades Council*, 354 F.2d 1, 3 (7th Cir.), *cert. denied*, 384 U.S. 960, 86 S.Ct. 1585, 16 L.Ed.2d 678 (1966) (*Suburban Tile*), for his holding on the labor antitrust exemption. He reasoned that we implicitly adopted *Suburban Tile*'s automatic exemption holding in *Brogan v. Swanson Painting Co.*, 682 F.2d 807 (9th Cir.1982) (*Brogan*), by completely ignoring an antitrust claim after finding that a clause in a collective bargaining agreement did not violate the labor laws. The district court concluded that *Brogan* amounted to an implicit rejection of the balancing approach to the labor antitrust exemption advanced in *Ackerman-Chillingsworth v. Pacific Electrical Contractors Association*, 579 F.2d 484, 501–04 (9th Cir.1978) (Hufstedler, J., concurring in part and dissenting in part), *cert. denied*, 439 U.S. 1089, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979). Finally, the district court concluded that its automatic exemption holding was not inconsistent with *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975) (*Connell*), or *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (*Pennington*).

We dismissed the initial appeal in this case for lack of subject matter jurisdiction on the ground that there was no final order or judgment. The parties then obtained a final judgment, however, and filed a new notice of appeal. We now review the merits.

II

■ The parties raise a narrow issue: whether the subcontracting limitation clauses involved here fall within the construction industry proviso to section 8(e). There are no factual issues in dispute. Nor do the parties dispute that the clauses fall within the general prohibition of section 8(e).[1] They also agree that the clauses would be sheltered from section 8(e) liability by a literal reading of the construction industry proviso.[2] The disagreement is over whether the clauses are sheltered by the construction industry proviso in light of legislative history. The question is thus reviewable de novo. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984) (*McConney*).

The question here is the same general one that was presented to the Supreme Court in *Connell* and *Woelke*. In *Connell*, the Court decided that, despite the proviso's literal language, it does not apply to agreements obtained outside the context of collective bargaining because Congress did not intend to authorize such agreements. 421 U.S. at 633, 95 S.Ct. at 1840. Within the collective bargaining arena, however, a unanimous Court in *Woelke* held "that the construction industry proviso to § 8(e) ... *ordinarily* shelters union signatory subcontracting clauses," 456 U.S. at 666, 102 S.Ct. at 2083 (emphasis added), and upheld

---

1. Section 8(e) of the NLRA provides in part:
   (e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void ....
   29 U.S.C. § 158(e).

2. The construction industry proviso to section 8(e) states:
   *Provided,* That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work ....
   29 U.S.C. § 158(e).

certain clauses even though they were not "limited in application to particular jobsites at which both union and nonunion workers are employed." *Id.*

■ The Court has held that the construction industry proviso is not to be interpreted literally, but "must be interpreted in light of the statutory setting and the circumstances surrounding its enactment." *Id.* at 653, 102 S.Ct. at 2077, *quoting Connell*, 421 U.S. at 628, 95 S.Ct. at 1837. This rule is a variation on a general rule of statutory construction: unambiguous statutory language is conclusive "in the absence of 'a clearly expressed legislative intent to the contrary.'" *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981), *quoting Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Instead of being conclusive, the proviso's language may be given only the effect Congress clearly intended it to be given. *See Woelke*, 456 U.S. at 654, 102 S.Ct. at 2077. This modification of the general rule is justified because the proviso is an exception to the general prohibition against hot cargo agreements. *See generally* Easterbrook, *The Supreme Court, 1983 Term— Foreward: The Court and the Economic System*, 98 Harv.L.Rev. 4, 14–18, 42–58 (1984). The general prohibition was enacted to overrule *Local 1976, United Brotherhood of Carpenters & Joiners v. NLRB*, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958), in which the Court indicated that employers and unions were free to enter into hot cargo agreements designed to boycott non-union products or services, *id.* at 108, 78 S.Ct. at 1020. *Woelke*, 456 U.S. at 654–55, 102 S.Ct. at 2077.

In *Woelke*, the Court rejected a nonunion employer's contention that the proviso should not apply to construction industry hot cargo agreements unless they are limited to construction projects where union and nonunion workers are both employed. *Id.* at 654, 102 S.Ct. at 2077. The employer argued that Congress intended the proviso to permit "only those subcontracting agree-

ments that are designed to reduce friction at particular jobsites," *id.* at 661, 102 S.Ct. at 2080, and intended the general prohibition to "restrict the ability of unions to engage in top-down organizing." *Id.* at 663, 102 S.Ct. at 2081. The Court rejected the job friction argument as a misreading of congressional intent and reasoned that Congress accepted as tolerable in the construction industry "whatever top-down pressure such clauses might entail." *Id.* The Court concluded from its own examination of the legislative history that "Congress 'wished to preserve the *status quo*' regarding agreements between unions and contractors in the construction industry." *Id.* at 657, 102 S.Ct. at 2078 (emphasis in original), *quoting National Woodwork Manufacturing Association v. NLRB*, 386 U.S. 612, 637, 87 S.Ct. 1250, 1264, 18 L.Ed.2d 357 (1967). Thus, whether a particular clause is within the scope of the proviso is determined "by examining Congress' perceptions regarding the status quo in the construction industry." *Id.*

With respect to the agreements being challenged in *Woelke*, the Court concluded that "Congress believed that broad subcontracting clauses similar to those at issue ... were part of the pattern of collective bargaining prior to 1959, and that the Board and the courts had found them to be lawful." *Id.* at 660, 102 S.Ct. at 2080. In addition, the Court found Congress' perceptions to be accurate and found no evidence to support the narrow construction urged by the petitioners. *Id.* at 660–61, 102 S.Ct. at 2080. Thus, it held that exemption of the particular clauses involved "is fully consistent with the legislative history of § 8(e) and the construction industry proviso." *Id.* at 660, 102 S.Ct. at 2080.

■ Sun-Land argues that the proviso should not be interpreted to cover the particular clauses involved in this case, however, because these clauses operate to exclude "other-union" labor rather than non-union labor. Although *Woelke* did not specifically address this proposed limitation on the scope of the proviso, the same an-

alytical framework applies. We must decide whether Congress perceived the status quo in 1959 as allowing the agreements challenged here.

Congressional perceptions concerning the permissibility of agreements like those involved in this case are difficult to ascertain because the legislative history contains only one reference to the problem. Representatives of an employer and an independent labor union argued before the House Labor Committee that all hot cargo agreements should be banned because otherwise they could result in "other-union" employers being denied the opportunity to compete for construction jobs. *Labor-Management Reform Legislation: Hearings on H.R.3540, H.R.3302, H.R.4473, and H.R. 4474 before a Joint Subcommittee of the House Committee on Education and Labor*, 86th Cong., 1st Sess. 2363, 2365–66 (1959) (remarks of Howard Lane and Edward M. Carlton), *cited in Woelke*, 456 U.S. at 658, 102 S.Ct. at 2079. The House proposal would have made it an unfair labor practice for any labor organization and any employer to enter into a hot cargo agreement. H.R.8400, § 705(b)(1), 86th Cong., 1st Sess. 65 (1959), *reprinted in* 1 NLRB, *Legislative History of the Labor-Management Reporting and Disclosure Act of 1959* 683 (1959) (hereinafter cited as *Legislative History*). The Senate proposal would have outlawed such agreements only in the trucking industry. 105 Cong.Rec. 5887–88 (1959), *reprinted in* 2 *Legislative History, supra*, at 1161–62 (remarks of Senators Gore and Kennedy). The Conference Committee nominally adopted the House version, but later inserted the construction industry proviso despite the arguments about "other-union" employers made before the House Labor Committee. Conf. Rep. No. 1147, 86th Cong., 1st Sess., *reprinted in* 1959 U.S.Code Cong. & Ad. News 2318, 2503, 2511–12. Although the legislative history is scant, what little exists indicates that Congress considered the specific problem involved here and concluded that the desirability of maintaining the status quo in the construction industry outweighed any unfairness to "other-union"

employers and their employees. We must give full and fair effect to Congress' intent. Thus, we agree with the district court and interpret the construction industry proviso to cover the agreements before us.

## III

■ We next consider whether these agreements are automatically exempt from antitrust scrutiny. The Supreme Court has recognized two forms of labor exemptions from the antitrust laws: statutory and nonstatutory. The statutory exemption applies whenever a union acts in its self-interest and does not combine with nonlabor groups. *See Connell*, 421 U.S. at 621–22, 95 S.Ct. at 1834–35; *United States v. Hutcheson*, 312 U.S. 219, 232, 61 S.Ct. 463, 466, 85 L.Ed. 788 (1941). Such an exemption is not available in this case because the Laborers combined with nonlabor groups through the collective bargaining agreements. Thus, whether the parties' conduct is exempt from antitrust scrutiny depends on whether the agreements qualify for the "limited non-statutory exemption." *Connell*, 421 U.S. at 622, 95 S.Ct. at 1835; *see also Local 189, Amalgamated Meat Cutters & Butcher Workmen v. Jewel Tea Co.*, 381 U.S. 676, 689, 85 S.Ct. 1596, 1601, 14 L.Ed.2d 640 (1965) (*Jewel Tea*); *Pennington*, 381 U.S. at 661–66, 85 S.Ct. at 1589–91.

■ The nonstatutory exemption derives from the accommodation that must be made "between the congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in business markets." *Connell*, 421 U.S. at 622, 95 S.Ct. at 1835; *see also Jewel Tea*, 381 U.S. at 689, 85 S.Ct. at 601; *Pennington*, 381 U.S. at 664–65, 85 S.Ct. at 1590. It permits restraints on competition in the labor market, despite an effect on price competition in the commercial market, unless the activity "contravenes antitrust policies to a degree not justified by national labor policies." *Connell*, 421 U.S. at 625, 95 S.Ct. at 1836. The test searches for potential restraints on commercial competition. In *Connell*, the

Court held that a particular hot cargo agreement that violated section 8(e) did not fall within the nonstatutory exemption because the "union and nonlabor party [had agreed] to restrain competition in a business market." *Id.* at 622–23, 95 S.Ct. at 1835. The Court rejected the argument that the secondary boycott remedies under the labor laws precluded application of antitrust remedies. *Id.* at 633–34, 95 S.Ct. at 1840.

■ The issue in this case is not whether these hot cargo agreements fall within the nonstatutory exemption, but whether they *automatically* fall within the exemption because they are acceptable under the construction industry proviso to section 8(e). The district court answered this question in the affirmative. We disagree because the secondary boycott prohibitions of section 8(e) and the antitrust laws do not have identical objectives. *See Pennington,* 381 U.S. at 664, 85 S.Ct. at 1590. The secondary boycott laws seek to eliminate unfair coercion on primary and secondary employers, and needless injury to the public. In contrast, the antitrust laws seek to encourage economic efficiencies by fostering reliance on the competitive process. Thus, even conduct that the labor statutes permit, in a proper case, may subject the parties to antitrust liability. For example, if hot cargo agreements like those in this case were used to enforce a cartel's product market allocation plan, they would be unlawful under the antitrust laws regardless of labor policy.

We reverse the district court's automatic exemption holding and remand for its initial determination of whether the nonstatutory exemption applies in this case under the proper approach of balancing labor and antitrust policies. *See Connell,* 421 U.S. at 622, 95 S.Ct. at 1835; *Jewel Tea,* 381 U.S. at 689, 85 S.Ct. at 1601; *Pennington,* 381 U.S. at 664–65, 85 S.Ct. at 1590. On remand, the district court must determine whether the agreements create such potential restraints on the business market that they "would not follow naturally from the elimination of competition over wages and working conditions," *Connell,* 421 U.S. at 625, 95 S.Ct. at 1836, but instead evidence that the "union and a nonlabor party [have agreed] to restrain competition in a business market." *Id.* at 622–23, 95 S.Ct. at 1835, *citing Allen Bradley Co. v. Electrical Workers,* 325 U.S. 797, 806–11, 65 S.Ct. 1533, 1538–41, 89 L.Ed. 1939 (1945). *See also Pennington,* 381 U.S. at 663–66, 85 S.Ct. at 1589–91. Even if the agreements merely restrain competition in the product market as a natural consequence of eliminating competition in the labor market, the nonstatutory exemption applies only to the extent that the agreements are the least restrictive means of accomplishing the legitimate labor goals. *See Jewel Tea,* 381 U.S. at 692–93, 85 S.Ct. at 1603.

Neither *Brogan,* 682 F.2d 807, nor *Suburban Tile,* 354 F.2d 1, compels a different result. The district court interpreted *Brogan* as implicitly adopting the automatic exemption rule because there we remanded a case involving an antitrust claim without addressing it after finding that a subcontracting clause did not violate the labor laws. Indeed, after reversing the adverse labor law ruling, we simply remanded "for further consideration of the trustees' claim." *Brogan,* 682 F.2d at 811. But this hardly compels the conclusion that *Brogan* adopted the suggested automatic rule. It would be inappropriate for us to speculate how the antitrust claim was resolved when the opinion does not discuss it. If in *Brogan* we found the nonstatutory exemption to apply, we may well have done so based on a balancing analysis rather than by a rule of automatic exclusion. Indeed, our court may have remanded the case to the district court without mentioning the antitrust claim because we expected the district court to reconsider the antitrust claim in light of its labor law reversal. Thus, *Brogan* cannot be dispositive of this issue.[3]

We give only limited weight to *Suburban Tile* because it failed even to mention *Pennington.* With respect, we conclude the Seventh Circuit rule is inappropriate and not consistent with Supreme Court precedent.

---

**3.** The union urges that this court has previously afforded an automatic exemption to valid labor contract provisions without any balancing of interests. *See California Dump Truck Owners Association v. Associated General Contractors,* 562 F.2d 607 (9th Cir.1977); *Granddad Bread v. Continental Baking Co.,* 612 F.2d 1105 (9th Cir. 1979), *cert. denied,* 449 U.S. 1076, 101 S.Ct. 854, 66 L.Ed.2d 798 (1981). A close reading of both opinions shows that the court analyzed the effects of the challenged provisions and concluded they did not impermissibly impinge on the business markets in question; thus the court performed the required balancing of interests.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.