John CARLSON, Marilyn Carlson, Anne Gallen, John Green, Bob Kachnycz, Rob McNeil, Theresa McNeil, Gail Moyer, Tom Moyer, Theresa Orsini, Paul Gallen, and Rose Valley Neighbors Association

v.

William CIAVARELLI and Joseph Stevens and Upper Dublin Township.

Appeal of: William Ciavarelli.

Commonwealth Court of Pennsylvania.

Argued June 20, 2014.

Decided Sept. 17, 2014.

Michael P. Coughlin, Blue Bell, for appellant.

Edward M. Wild, Doylestown, for appellees.

BEFORE: DAN PELLEGRINI, President Judge, and P. KEVIN BROBSON, Judge, and ANNE E. COVEY, Judge.

OPINION BY Judge COVEY.

William Ciavarelli (Ciavarelli) appeals from the Montgomery County Common Pleas Court's (trial court) November 1, 2013 order denying his Motion for Hearing to Determine Immunity (Immunity Motion) and declaring that he is not immune from claims asserted in a Petition to Assess Counsel Fees (Petition) filed by Rose Valley Neighbors Association (Association).[1] The issues for this Court's review are: (1) whether the trial court erred by holding that Ciavarelli was not entitled to immunity under what is commonly referred to as the Environmental Immunity Act (Act)[2] for the claims in the Association's Petition; and (2) whether the trial court erred by considering evidence and conduct that occurred before September 21, 2011, the date Ciavarelli filed his special exception application, when deciding Ciavarelli's Immunity Motion.[3] Upon review, we affirm.

Ciavarelli owns 5.09 acres of real property located at 951 East Butler Pike in Upper Dublin Township (Township) on which he operates a funeral home (Property). Ciavarelli resides on the second floor of the funeral home. In 2007, Ciavarelli filed a plan to subdivide the Property into two lots, one for the existing funeral home/residence, and the other for an additional single-family dwelling, a pool house and a pool. Reproduced Record (R.R.) at 57a. After the Township identified certain violations of the Township's Zoning Ordinance of 1956 (Township Ordinance) and its Subdivision and Land Development Ordinance (SALDO) in the proposed subdivision plan (primarily those prohibiting more than one principal dwelling on a property), Ciavarelli withdrew the plan. In May 2008, Ciavarelli hired architect Joseph Stevens (Stevens) who prepared plans for a two-story residence for Ciavarelli's son complete with second-floor bedrooms and bathrooms to be located on the Property. Thereafter, Stevens re-drafted the plans removing the second floor bathrooms and bedrooms and designating that space for

---

1. The Association is an unincorporated group of neighbors residing in the Township's Rose Valley neighborhood consisting of John and Marilyn Carlson, Anne and Paul Gallen, John Green, Bob Kachnycz, Rob and Theresa McNeil, Gail and Tom Moyer and Theresa Orsini. *See* Reproduced Record at 29a.

2. 27 Pa.C.S. §§ 8301–8305.

3. Ciavarelli's brief included a third issue— whether the trial court erred as a matter of law and/or abused its discretion by concluding that the Association had met its burden of proving that Ciavarelli made specific misrepresentations to the Township or its ZHB. Since that issue is subsumed in our analysis relative to the first issue, it will not be separately discussed herein.

"storage only." *See* R.R. at 103a, 389a–390a, 414a–415a. The building was labeled a poolside "cabana" and garage not intended for residential occupancy which the Township permitted as an accessory structure.[4]

In December 2008, Ciavarelli applied to the Township's zoning hearing board (ZHB) for a building permit. Although initially denied because the proposed cabana's atypical size lent itself to expansion of the funeral home use, the Township ultimately granted the building permit on June 4, 2009, and Ciavarelli commenced building.

On November 13, 2009, the Township issued a Notice of Determination (Notice) based, *inter alia,* upon information that Ciavarelli was constructing three bathrooms on the cabana's second floor, which had been approved for storage only. *See* R.R. at 64a. The Notice stated that "the Township will deny any plans to install bathrooms on the second floor as a deterrent to any residential use of the building, which is prohibited." R.R. at 64a. The Notice warned Ciavarelli that ongoing construction violated Township Ordinance Section 255–27, and would result in a Stop Work Order. By December 9, 2009 letter, the Township notified Ciavarelli that, based upon its December 4, 2009 inspection, there was plumbing installed on the second floor to accommodate bathrooms, and there were room partitions and three walk-in closets for which permits had not been obtained. On December 11, 2009, the Township issued a Stop Work Order. Ciavarelli appealed to the ZHB. The Association intervened claiming that Ciavarelli intended to construct a second principal dwelling on the Property. In March 2010; Ciavarelli withdrew his appeal, removed some pipes and capped off the second-floor plumbing. Construction of the cabana was completed, and a temporary occupancy permit was issued in August 2010. In May 2011, the Township issued a final certificate of occupancy.

On September 21, 2011, Ciavarelli filed an application with the ZHB seeking a special exception to convert the cabana's second floor into an accessory residential dwelling for his son (Application) pursuant to Township Ordinance 255–27.E.[5] The Association and the Township intervened and opposed Ciavarelli's Application.

The Association requested pursuant to a ZHB-issued subpoena that Ciavarelli and Stevens produce documentation of the size,

---

4. At that time, there was no pool on the Property to which the proposed cabana would be accessory. Moreover, the proposed cabana consisted of two floors and a three-car garage totaling approximately 4,200 square feet of usable space. R.R. at 284a. The first floor is an open space containing living room and family room areas, a bathroom and a kitchenette (without a stove). R.R. at 284a. The second floor, intended for storage, is located above the first-floor kitchenette, bathroom and garage areas, and overlooks the first-floor family room. R.R. at 284a–285a.

5. Township's Ordinance 255–27.E authorizes:

The following uses shall be accessory to dwellings:

. . . .

E. The following when authorized as a special exception for existing structures: [Amended 1–10–1995 by Ord. No. 879]
(1) Dwelling unit within the principal building or a building accessory thereto for household employees, caretakers, watchmen, or members of the owner's immediate family, provided the following conditions are met: [Amended 3–12–2002 by Ord. No. 1080]
   (a) The owner shall record a covenant to run with the land restricting the use of such unit to these purposes.
   (b) The off-street parking requirements of this chapter are met for both dwelling units.
(2) The renting of an accessory dwelling on the property.
R.R. at 514a–515a.

cost and intended use of the cabana to support its purported accessory and customarily incidental nature. A hearing was held before the ZHB on November 28, 2011. The ZHB re-convened on December 19, 2011 and January 23, 2012 to allow Ciavarelli and Stevens to produce the subpoenaed documentation, but they did not. Ciavarelli and Stevens refused to produce the requested documents on the basis that the request was overly broad, and unrelated and irrelevant to the Application. On February 9, 2012, the Association filed a petition with the trial court to enforce its subpoena. The trial court scheduled a hearing for February 14, 2012. However, due to negative publicity and what Ciavarelli deemed an uphill battle, he withdrew his Application on February 13, 2012, the day before the hearing.

On February 21, 2012, the Association filed its Petition seeking counsel fees in excess of $20,000.00 from Ciavarelli and Stevens[6] pursuant to Section 2503 of the Judicial Code, 42 Pa.C.S. § 2503, stating:

Ciavarelli intentionally engaged in conduct, commencing various matters and otherwise, that is dilatory, obdurate, vexatious, fraudulent, frivolous and in bad faith, in violation of 42 Pa.C.S.[ ] § 2503[,] and [Stephens] refused, *inter alia,* to abide by a duly issued subpoena without any justification, such that [the Association] is entitled to the recovery of counsel fees and costs expended.

R.R. at 46a. Ciavarelli denied that the Association was entitled to counsel fees, *inter alia,* because he was immune from civil liability pursuant to the Act and the *Noerr–Pennington* Doctrine.[7]

On April 23, 2012, Ciavarelli filed his Immunity Motion. The Association opposed the Immunity Motion. The trial court held a hearing on August 13, 2013. On November 1, 2013, the trial court denied and dismissed Ciavarelli's Immunity Motion. On November 5, 2013, Ciavarelli appealed to this Court.[8]

### 1. Immunity

■ Ciavarelli first argues that the trial court erred as a matter of law and/or abused its discretion by ruling that he was

---

6. By May 2012 stipulation, the parties voluntarily discontinued this action against Stevens.

7. This Court has explained:
   The *Noerr–Pennington* Doctrine, named for *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), holds that individuals and organizations are immune from liability under antitrust laws for exercising their First Amendment right to petition government and also immune from tort liability for protected political activity. *See Penllyn Greene Assocs., L.P. v. Clouser,* 890 A.2d 424, 429 n. 5 (Pa.Cmwlth. 2005) [*Penllyn Greene* ].
   *Pennsbury Vill. Assocs. v. McIntyre,* 949 A.2d 956, 959 n. 2 (Pa.Cmwlth.2008), *rev'd on other grounds,* 608 Pa. 309, 11 A.3d 906 (2011).

8. The Association filed a motion to quash Ciavarelli's appeal as interlocutory, which Ciavarelli opposed. By January 16, 2014 order, this Court (Pellegrini, P.J.) permitted Ciavarelli's interlocutory appeal pursuant to Section 8303 of the Act and Pa.R.A.P. 311(a)(8), and stated: "No other issues will be considered in this interlocutory appeal." Consequently, Ciavarelli's immunity claim under the *Noerr–Pennington* Doctrine is not before this Court.

The trial court's decision on the merits of the Association's Petition has been stayed pending the outcome of this appeal.

"These issues involve interpretation and application of the [Act], and present questions of law. Questions of law are subject to *de novo* review, and our scope of review is plenary. Further, appellate courts accord deference to a trial court with regard to factual findings." *Pennsbury Vill. Assocs. v. McIntyre,* 608 Pa. 309, 11 A.3d 906, 912 (2011) (citations and quotation marks omitted).

not entitled to immunity under the Act for the claims in the Association's Petition. The Pennsylvania Supreme Court has declared:

> A trial court must utilize a two-step process in analyzing an immunity claim raised pursuant to the [Act]. First, the party seeking immunity must make a threshold showing the cause of action arose because he
>
>> [f]ile[d] an action in the courts of this Commonwealth to enforce an environmental law or regulation ... **or made an oral or written *communication* to a government agency relating to enforcement or implementation of an environmental law or regulation ... where the action or communication is aimed at procuring favorable governmental action.**
>
> 27 Pa.C.S. § 8302(a). If the court determines [that] this threshold is satisfied, the party opposing immunity must then demonstrate one of the *statutory exceptions* applies, *id.,* § 8302(b), or that some other overriding legal basis defeats the immunity claim.... The court shall hold a hearing if the party seeking immunity files a motion requesting a hearing. 27 Pa.C.S. § 8303.

*Pennsbury Vill. Assocs. v. McIntyre,* 608 Pa. 309, 11 A.3d 906, 912 (2011) (emphasis added).

### a. Communications

Ciavarelli asserts that the Township and the ZHB are governmental agencies under the Act, and Ciavarelli's communications described in the Petition relate to his compliance with the Township's ordinances designed to protect and govern the Township's environment, including those related to storm water, erosion and sedimentation control, lighting and landscaping. Therefore, the trial court erred by holding that Ciavarelli's Application did not involve the implementation and enforcement of an environmental law and regulations protected by statutory immunity under the Act. However, neither the Act nor the record supports Ciavarelli's position.

Section 8301 of the Act defines the terms "communication to the government" and "government agency" as follows:

> **'Communication to the government.'** A written or oral statement or writing made:
>
> . . . .
>
> (3) to a government agency in connection with the implementation and enforcement of environmental law and regulations.
>
> . . . .
>
> **'Government agency.'** The Federal Government, the Commonwealth and any of the Commonwealth's departments, commissions, boards, agencies, authorities, political subdivisions or their departments, commissions, boards, agencies or authorities.

27 Pa.C.S. § 8301. Thus, in order to be a communication for which immunity may be afforded under Section 8302(a) of the Act, the communication must be (1) "to a government agency" *and* (2) "in connection with the implementation and enforcement of environmental law and regulations." 27 Pa.C.S. § 8301; *see also* 27 Pa.C.S. § 8302(a) ("relat[ed] to enforcement or implementation of an environmental law or regulation"). Because the Township is a political subdivision and the ZHB is its board, they fall under the definition of "government agency" such that any oral and written statements Ciavarelli made to them "in connection with the implementation and enforcement of environmental law and regulations" would constitute "communication to the government" to gain "favorable governmental action." 27 Pa.C.S. § 8302.

Copies of photographs, plans, applications, letters, certificates and the transcript from the November 28, 2011 ZHB meeting were introduced at the Immunity Motion hearing. Ciavarelli's counsel also testified regarding the entire history of the Ciavarelli's land use and zoning actions related to the cabana construction, and admitted that she advised Ciavarelli and Stevens not to produce documents in response to the Association's subpoena. Based upon the evidence, the trial court properly concluded that Ciavarelli's zoning applications "[p]lainly ... do not" involve the implementation and enforcement of and environmental law and regulations and, citing *Penllyn Greene Associates, L.P. v. Clouser*, 890 A.2d 424 (Pa.Cmwlth. 2005), that zoning and land use proceedings are not the type of action protected by the Act's statutory immunity.

In the Act's preamble, the General Assembly declared:

(1) It is contrary to the public interest to allow lawsuits, known as Strategic Lawsuits Against Public Participation (SLAPP), to be brought primarily to chill the valid exercise by citizens of their constitutional right to freedom of speech and to petition the government for the redress of grievances.

(2) It is in the public interest to empower citizens to bring a swift end to retaliatory lawsuits seeking to undermine their participation in the establishment of State and local environmental policy and in the implementation and enforcement of environmental law and regulations. Preamble to the Act of December 20, 2000, P.L. 980 (quotation marks omitted). Section 8301 of the Act defines those actions as follows:

'Enforcement of environmental law and regulation.' Activity relating to the identification and elimination of violations of environmental laws and regulations, including investigations of alleged violations, inspections of activities subject to regulation under environmental law and regulations and responses taken to produce correction of the violations.[9]

. . . .

'Implementation of environmental law and regulation.' Activity relating to the development and administration of environmental programs developed under environmental law and regulations.[10]

27 Pa.C.S. § 8301. "Environmental law and regulation" is not defined in the Act.

█ "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). '[T]he General Assembly's intent is best expressed through the plain language of the statute.' *Commonwealth v. Brown* [603 Pa. 31], 981 A.2d 893, 897 ([Pa.] 2009).... Therefore, when the terms of a statute are clear and unambiguous, they will be given effect consistent with their plain and common meaning. 1 Pa.

---

9. In this context, "enforcement" means "[t]he act or process of compelling compliance with a law, mandate, command, decree or agreement." *Black's Law Dictionary* 608 (9th ed. 2009).

10. In this context, "implement" means "1: CARRY OUT, ACCOMPLISH; esp: to give practical effect to and ensure of actual fulfillment by concrete measures...." *Merriam–* *Webster's Collegiate Dictionary* 624 (11th ed. 2004). "Development" is defined as "1: the act, process, or result of developing <—of new ideas> <an interesting—> 2: the state of being developed <a project in—>." *Id.* at 342. "Administration" is defined as "1: performance of executive duties: MANAGEMENT 2: the act or process of administering." *Id.* at 16.

C.S.[ ] § 1921(b).... This means ascribing to the particular words and phrases the definitions which they have acquired through their common and approved usage. 1 Pa.C.S.[ ] § 1903.

*Commonwealth v. Hart,* 611 Pa. 531, 28 A.3d 898, 908 (2011) (citations omitted). "[Where] the legislature did not define [a] term, its common and approved usage may be ascertained by examining its dictionary definition." *Id.* at 909. *Black's Law Dictionary* (9th ed. 2009) defines "environmental law" as "[t]he field of law dealing with the maintenance and protection of the environment, including preventative measures such as the requirements of environmental-impact statements, as well as measures to assign liability and provide cleanup for incidents that harm the environment...." [11] *Id.* at 614.

Ciavarelli contends that the Township Ordinances limiting his ability to build on the Property are designed to protect and govern the environment, so his communications with the Township and the ZHB to procure favorable government action (*i.e.,* zoning approval) did, in fact, relate to the implementation and enforcement of an environmental law and regulations. We disagree.

Township's Ordinance 255–2 states:

This chapter is enacted for the purpose of promoting the health, safety, morals and the general welfare of the Township, is designed to lessen congestion in the roads and highways, to secure safety from fire, panic and other danger, to provide adequate light and air, to prevent the overcrowding of land, to avoid undue congestion of population, to facilitate the adequate provision of transportation, water sewerage, schools, parks and other public requirements, to con-

serve the value of buildings and to encourage the most appropriate use of land throughout the Township.

R.R. at 511a. Township Ordinance 255–4 requires, in pertinent part:

Minimum requirements; objectives. [Amended 1–10–1995 by Ord. No. 879]

In interpreting, implementing and applying the broad purposes and objectives set forth in § 255–1 above [relating to Titles; when effective], the provisions of this chapter shall be held to be the minimum requirements for the promotion of the health, safety, morals and the general welfare of the Township. This chapter is enacted to implement the purpose set forth in § 255–2 above, in the respects therein stated and more particularly with a view toward the following community development objectives:

A. Guiding and encouraging the future development of the Township in accordance with comprehensive planning of land use and population, density that represents the most beneficial and convenient relationships among the residential, commercial, industrial and recreational areas within the Township, having regard to their suitability for the various uses appropriate to each of them and their potentiality for such uses, as indicated by topography and soil conditions, existing man-made conditions and the trends in population, in the direction and manner of the use of land in building development and in official in the enforcement of said Act or of this chapter adopted pursuant thereto. To interpret upon the words, terms, rules, regulations, provisions and restrictions of this chapter where there is

---

**11.** Using the *Merriam–Webster Dictionary,* Ciavarelli defines "environment" merely as "surroundings." Ciavarelli Br. at 27.

doubt as to the meaning thereof, including determination in specific instances whether questionable uses are permitted by virtue of being similar to or customarily incidental to permitted uses as provided by this chapter.

B. Special exceptions. To hear and decide special exceptions to the terms of this chapter in such cases as are herein expressly provided for, in harmony with the general purpose and intent of this chapter with power to impose appropriate conditions and safeguards.

R.R. at 511a–512a.

Township Ordinance 255–174 mandates: Standards for actions.

A. In any instance where the [ZHB] is required to consider a . . . special exception . . . brought before it in accordance with this chapter or the Pennsylvania Municipalities Planning Code [ (MPC) ],[12] the Board shall, among other things:

[Amended 1–10–1995 by Ord. No. 879]

(1) Consider the suitability of the property for the use desired; assure itself that the proposed change is consistent with the spirit, purpose and intent of this chapter.

(2) Determine that the proposed change will not substantially injure or detract from the use of neighboring property or from the character of the neighborhood and that the use of the property adjacent to the area included in the proposed change or plan is adequately safeguarded.

(3) Determine that the proposed change will serve the best interests of the Township, the convenience of the community (where applicable) and the public welfare.

(4) Consider the effect of the proposed change upon the logical, efficient and economical extension of the public service and facilities such as public water, sewers, police and fire protection and public schools.

(5) Consider the suitability of the proposed location of an industrial or commercial use with respect to the probable effects upon highway traffic and assure adequate access arrangements in order to protect major streets from undue congestion and hazard.

(6) Be guided in its study, review and recommendation by sound standards of subdivision practice, where applicable.

(7) Determine that there are special circumstances or conditions fully described is the findings applying to the land or buildings for which the variance is sought, which circumstances or conditions are such that the application of the provisions of this chapter should deprive the applicant of the reasonable use of such land or building.

(8) Determine that the unique circumstances for which the variance is sought were neither created by the owner of the property nor were due to or the result of general conditions in the district in which the property is located.

B. Conditions should be increased greatly in detail, especially when reviewing special exceptions. The Board should state the methods of plan preparation, review and approval (Planning Commission and Commissioners) and what zoning ordinances and/or subdivision regulations apply and impose such conditions, in addition to those required, as are necessary to assure that the intent of this chapter is complied with, which conditions may include but are not limited to harmonious design of buildings, planting and its maintenance as a sign or sound screen, the minimizing of noxious, offensive or hazardous elements

---

**12.** Act of July 31, 1968, P.L. 805, *as amended,*  53 P.S. §§ 10101–11202.

and adequate standards of parking and sanitation.

R.R. at 512a–513a.

While it is clear that the Township must concern itself with minimizing environmental hazards, Ciavarelli's applications and, therefore, his communications with the Township did not pertain to an environmental law and regulations. At the November 28, 2011 ZHB meeting, Stevens stated that he modified the cabana site plan, rotating it from its approved location so that the driveway would not disturb as much grading. R.R. at 382a–385a. Thereafter, at the Immunity Motion hearing, Ciavarelli's counsel Amee Smith Farrell (Farrell) testified in general terms:

> Q. And can you briefly explain the difference between the SALDO, the Subdivision and Land Development Ordinance, versus the [T]ownship's zoning ordinance?
>
> A. Sure. Zoning generally addresses itself with the uses of a property and the impact of those uses on the surrounding property. So zoning concerns itself largely with the building environment, how big is the building going to be in terms of its location on the site, where is it going to sit, what kind of impact is that going to have on surrounding properties with respect to runoff, lighting, noxious odors, noise, et cetera. So you will see in zoning ordinances particular restrictions and requirements with respect to impervious coverage, building coverage, whether or not you are permitted to impact steep slopes and other sorts of grades, flood plains, riparian buffers, et cetera. Those all become part and parcel of what you are or are not permitted to do with zoning.
>
> The [SALDO] is generally concerned with the broader site development concerns, a lot of the same kinds of concerns that the zoning ordinance has with respect to impact on flood plains, slopes, water runoff, et cetera, but it's on a more engineered level. So it gets more into the specifics of a building's or development's layout, how big a parking space would be, how many you are required to have, what kind of landscaping and buffering you need, what sorts of storm water management requirements or improvements you may have to install in order to protect surrounding properties, that sort of thing. So there is quite a bit of overlap, but you don't always need zoning relief if you are doing a land development.

R.R. at 608a–610a. At no point during the Immunity Motion hearing did Ciavarelli present evidence that his communications with the Township and the ZHB specifically "related to or implementation and enforcement of an environmental law and regulations." Similarly, no environmental provision of either the Township's SALDO or the Township's Ordinances is implicated by Ciavarelli in this appeal.

In *Penllyn Greene*, residents expressed their concerns pertaining to the environmental impact of residential home development. For years, they argued to the township that development would disturb and disperse deadly contaminants. Notwithstanding, the township approved the developer's land use and zoning applications, and the residents appealed. Hours before the hearing was to commence (after having it continued once), the residents withdrew their appeal. Due to the residents' actions—which included removing survey stakes, making false representations, and cursing and making obscene gestures to real estate brokers and potential home buyers—the developer filed a complaint against the residents for abuse of process, tortious interference with a contract and trespass. The residents sought immunity under Section 8302 of the

Act. This Court affirmed the trial court's holding, *inter alia,* "that zoning appeals and land use appeals are not the type of action or litigation protected under the Act," reasoning:

> Although one of the grounds for the land use appeal arguably subsumed an environmentally-related issue, the 'action' i.e., the land use appeal, did not relate to the identification and elimination of [the d]evelopers' violation of any environmental law or regulation. Rather, [the r]esidents' land use appeal requested the [t]ownship to set aside the Board's allegedly arbitrary and capricious approval of [the d]eveloper's conditional use application. Similarly, [the r]esidents' zoning appeal challenged the validity of the zoning change from single family homes to 36 carriage homes. These appeals related to alleged violations of the [MPC], and these appeals were not vehicles designed to enforce the Commonwealth's environmental laws and regulations. Accordingly this Court rejects [the r]esidents' contention that the land use and zoning appeals briefly pending before the Board constituted the type of government petitioning activity that entitled them to immunity under the Act.

*Penllyn Greene,* 890 A.2d at 435 (citation omitted).[13]

In *Pennsbury Village Associates,* a developer sought conditional use for high-density residential development on land subject to a deed restriction limiting use of the land to open space/park land/recreational purposes because of a grant program. The township approved the application subject to conditions. A resident appealed from the approval, and the developer appealed from the use conditions. The parties negotiated a stipulation wherein it was agreed that the township would determine the access road configuration. The stipulation also included provisions regarding wastewater treatment. However, the resident opposed the township's access road and wastewater treatment determinations as contrary to the deed restrictions. The developer sued the resident for breach of contract, tortious interference with a contractual relationship and conspiracy. The resident claimed that he was entitled to immunity under Section 8302 of the Act. At the hearing, when asked what environmental law or regulation applied to give the resident immunity, the resident cited storm water run-off concerns and the deed restrictions. The trial court held that the resident's communications "could not be equated with 'the implementation or enforcement of environmental law and regulations.'" *Id.* at 916. The resident appealed to this Court which reversed the trial court's order, stating that the resident was seeking to enforce deed restrictions which, because they were based on what is commonly known as the Open Space Lands Act,[14] constituted an "environmental law and regulations" under Section 8302 of the Act.[15] The Supreme Court reversed this Court's order. Our Supreme Court, hav-

---

13. Ciavarelli's counsel represented the developer in *Penllyn Greene.* Ciavarelli contends that *Penllyn Greene* is inapposite since it "turned on the unique facts and procedural history of that case," and it did not declare that all zoning and land use proceedings fall outside the scope of the Act. Ciavarelli Br. at 33. Rather, "SLAPP suits arise most commonly in the land use and zoning context. The [Act], which was specifically enacted to combat SLAPP lawsuits, was certainly intend-

ed to be applied in the land use and zoning contexts...." Ciavarelli Br. at 39.

14. Act of January 19, 1968, P.L. (1967) 992, *as amended,* 32 P.S. §§ 5001–5013.

15. The concurrence to this Court's majority opinion stated that the action related to implementation rather than enforcement of an environmental law or regulation.

ing determined that the stipulation rendered the resident unable to take advantage of the Act's immunity provisions, did not decide whether the deed restrictions constituted environmental law and regulations. Nevertheless, the Supreme Court stated:

However, we agree with the trial court's finding that potential worries about future storm water run-off cannot be equated with the implementation or enforcement of environmental law and regulations....

[The resident] had the burden of showing he was entitled to immunity, and **failed to identify any environmental laws or regulations he petitioned the [township] to enforce** pursuant to the [Act], other than the deed restrictions.

*Pennsbury Vill. Assocs.,* 11 A.3d at 916 (quotation marks omitted; emphasis added).

In the instant appeal, the record evidence demonstrates that the underlying case concerned whether Ciavarelli was constructing a second principle dwelling versus an accessory use on the Property. His applications and communications with the Township and the ZHB were focused on meeting the special exception criteria; they were not connected to the implementation and enforcement of Township environmental programs and, therefore, Section 8302(a) of the Act is inapplicable. Having determined that Ciavarelli did not meet his burden relative to Section 8302(a) of the Act, the burden never shifted to the Association to prove that a Section 8302(b) exception applied.

### b. Exception

◼ The Association contends that even if Ciavarelli invoked some sort of environmental law or regulation, his conduct in doing so was knowingly false, deliberately misleading or made with malicious and reckless disregard for the truth or falsity and, therefore, he is not entitled to immunity for his communications by virtue of Section 8302(b)(1) of the Act. We agree.

Section 8302(b) of the Act provides:

**A person shall not be immune under [Section 8302(a) of the Act]** if the allegation in the action or **any communication to the government is not relevant or material to the enforcement or implementation of an environmental law or regulation** *and:*

**(1) the allegation in the action or communication is knowingly false, deliberately misleading or made with malicious and reckless disregard for the truth or falsity;**

(2) the allegation in the action or communication is made for the sole purpose of interfering with existing or proposed business relationships; or

(3) the oral or written communication to a government agency relating to enforcement or implementation of an environmental law or regulation is later determined to be a wrongful use of process or an abuse of process.

27 Pa.C.S. § 8302(b) (emphasis added).

The trial court concluded "[that the Association] met [its] burden of proving the applications were knowingly false and misleading" such that the Act's statutory immunity does not apply. Trial Ct. Op. at 6. The trial court reached its conclusion "based on the obvious nature of the building, as shown by the photograph and the excerpts from the testimony before the [ZHB], both of which were admitted without objection, the testimony at the hearing, and the exhibits." Trial Ct. Op. at 6–7.

Stevens' testimony at the November 28, 2011 ZHB meeting alone supported the trial court's conclusion:

Q. Now, when you first started working on this job, what were your instruc-

tions from Mr. Ciavarelli as to what you were to design?

A. We ultimately wanted to design a residential structure.

Q. No, not what you wanted to design, what were your instructions from Mr. Ciavarelli?

A. To design a residential structure in accordance with what the Code would permit, the Code and Ordinances of the Township would permit.

Q. That is it?

A. Well, we talked about bedrooms and bathrooms, and so forth.

Q. Tell me about your conversation about bedrooms and bathrooms?

A. I don't recall how many we thought we would create. Actually the first design had a full second floor, I believe, and then when we realized the height limitations were going to push the roof down on us, we had to change that. We go through a process where we look at a lot of different things.

Q. I'm not asking you that. I'm asking you what your conversation was with him; what did he ask for?

A. We wanted ultimately to get approval for what we are asking for today.

Q. What did he want?

. . . .

THE WITNESS: He wanted a four car garage. He wanted an entertainment space for the family to use, ultimately put a pool outside, and what he really would ultimately like to have is bedrooms on the second floor. He asked me to design it to consider what it would be like. He asked me when we provided the construction drawings to the Township not to show the residential, the bedrooms and bathrooms upstairs.

R.R. at 403a–405a. Ultimately, Stevens' design was designated a cabana, and the Township issued a building permit under the condition that the second floor be used solely for storage. Stevens stated:

A. . . . [T]he kitchen was limited not to have a stove, because we didn't want to interfere, we were not trying to create two residential uses on a property.

Q. You were not trying to do that?

A. No.

Q. So, but for a stove in the area of the kitchen, what is the difference between what you originally designed, as what he asked for, and a separate residential house?

A. The stove.

Q. The stove?

(Laughter in the audience.)

. . . .

Q. And did he tell you at that time that what he wanted to do was to create a residence for his son?

A. Yes.

Q. So you then set about to create a set of plans, and you came up with what I'm looking at as A–5, correct?

A. Yes. Well, that ultimately was the last plan, yes.

Q. Does A–5 frame out the bedrooms on the second floor?

A. Yes, they're there.

Q. And you have set those forth as "exercise room" and "weight room"?

A. Yes.

Q. Correct?

A. Yes.

Q. Is that because that is what Mr. Ciavarelli asked you to do, or is that what you just thought up?

A. . . . [W]hen we got approval from the Township to build the building, at that time we didn't show all of those walls upstairs, we only showed the load[-]bearing walls, and that is what was approved. During construction the

building official that was inspecting it said that this is a residential use. He pretty much told us we could have bedrooms and bathrooms because it was residential, and we put the walls in, and the bathrooms were partly installed when we submitted our as[-]built showing it, and then we were told we could not have it. There was a meeting at the site. We removed the bathrooms. That is what the Township asked us to do, so the walls stayed, and they did not ask us to remove them.

Q. So, the second floor is a completely framed out second floor but for plumbing for the bathrooms?

A. That is right.

Q. And yet you have labeled these "exercise room" and "weight room," and my question is, is that what Mr. Ciavarelli asked you to do?

A. Yes.

R.R. at 407a–410a.

The record supports the trial court's conclusion that Ciavarelli's goal was to create a second residence on the Property for his son and, in doing so, he made misrepresentations to the Township. When his efforts to have the Property subdivided failed, he sought to build what he deemed a "cabana" consisting of 4,200 square feet of space on two floors to be used solely as a pool gathering space. A building permit was approved subject to the condition that the second floor be for storage only. During construction, bedrooms and bathrooms were nevertheless created on the second floor. After the Township stopped Ciavarelli, the plumbing was removed, and the upstairs rooms were labeled as exercise/weight rooms. Thereafter, Ciavarelli applied for a special exception to create an accessory residential dwelling for his son

which Stevens confirmed was Ciavarelli's ultimate goal. At the eleventh hour, Ciavarelli withdrew his Application.

Based upon the evidence, and affording the trial court deference as we must, there was support for the trial court's conclusion that the Association met its burden of proving that Ciavarelli's communications excepted him from immunity under Section 8302(b)(1) of the Act. Accordingly, we hold that the trial court did not err by ruling that Ciavarelli was not immune under the Act for the claims in the Association's Petition.

### 2. Conduct Review

■ Ciavarelli also argues that the trial court erred as a matter of law and/or abused its discretion by considering evidence and conduct that occurred before the September 21, 2011 filing of Ciavarelli's Application when deciding his Immunity Motion. Ciavarelli contends that his conduct preceding his Application is "completely irrelevant" to the Association's Petition and his Immunity Motion. Ciavarelli Br. at 21. We disagree.

It is clear from the trial court's conclusion that it considered records and testimony about all of Ciavarelli's dealings with the Township and the ZHB since 2007 pertaining to the Property in reaching its conclusion that he is not entitled to immunity.[16] We acknowledge that although Section 2503 of the Judicial Code limits the trial court's review of Ciavarelli's conduct during the subpoena enforcement litigation in awarding counsel fees, there is no similar restriction in the Act prohibiting the trial court's consideration of Ciavarelli's conduct before his September 21, 2011 fil-

---

**16.** Although Ciavarelli's Immunity Motion is his response to the Association's Petition, this Court's review was limited by its January 16, 2014 order to review of the Immunity Motion. "No other issue will be considered in this interlocutory appeal." *See supra* note 8.

ing of his Application when deciding his Immunity Motion.

Section 2503 of the Judicial Code provides, in pertinent part:

> The following participants shall be entitled to a reasonable counsel fee as part of the taxable costs of the matter:
>
> . . . .
>
> (6) Any participant who is awarded counsel fees as a sanction against another participant for violation of any general rule which expressly prescribes the award of counsel fees as a sanction for dilatory, obdurate or vexatious conduct **during the pendency of any matter.**
>
> (7) Any participant who is awarded counsel fees as a sanction against another participant for dilatory, obdurate or vexatious conduct **during the pendency of a matter.**
>
> . . . .
>
> (9) Any participant who is awarded counsel fees because the **conduct of another party in commencing the matter or otherwise** was arbitrary, vexatious or in bad faith.

42 Pa.C.S. § 2503 (emphasis added).

"[A]n award for counsel fees under Section 2503 [of the Judicial Code] is meant to compensate the innocent litigant for costs caused by the actions of the opposing party." *Maurice A. Nernberg & Assocs. v. Coyne,* 920 A.2d 967, 972 (Pa.Cmwlth. 2007). "[Section 2503 of the Judicial Code], by its very terms, is a 'taxable costs' provision, thereby relating to the conduct of a party at some point **during the *litigation* process.**" *Bucks Cnty. Servs., Inc. v. Phila. Parking Auth.,* 71 A.3d 379, 393 (Pa.Cmwlth.2013) (emphasis added). Thus, activity that occurs **before litigation** is commenced cannot form the basis for a counsel fee award. *Westmoreland Cnty. Indus. Dev. Auth. v. Allegheny Cnty. Bd. of Prop. Assessment, Appeals & Review,* 723 A.2d 1084 (Pa.Cmwlth.1999).

The term "litigation" is defined as "[t]he process of carrying on a lawsuit." *Black's Law Dictionary* 1017 (9th ed. 2009). The definition of "lawsuit" in its verb form is "[t]o proceed against (an adversary) in a lawsuit; to sue." *Id.* at 968. "Lawsuit" as a noun refers to "suit." *Id.* at 967. "Suit" is defined as "[a]ny proceeding by a party or parties against another in a court of law." *Id.* at 1572. Moreover, in *Independence Blue Cross v. Workers' Compensation Appeal Board (Frankford Hospital),* 820 A.2d 868, 874 (Pa.Cmwlth.2003), this Court held that "Section 2503 of the Judicial Code **applies only to components of the unified judicial system,** unless there is specific language otherwise." (Emphasis added); *see also Dep't of Transp., Bureau of Driver Licensing v. Smith,* 145 Pa.Cmwlth. 164, 602 A.2d 499, 502 (1992) ("The Judicial Code, specifically [S]ection 2503, does not authorize the agencies of this Commonwealth to make awards of attorneys' fees in agency proceedings[.]").

Accordingly, unless otherwise expressly permitted, counsel fees may be awarded for conduct in the commencement of or during the pendency of litigation before components of the unified judicial system. Article 5, Section 1 of the Pennsylvania Constitution specifies that the

> unified judicial system consist[s] of the Supreme Court, the Superior Court, the Commonwealth Court, courts of common pleas, community courts, municipal and traffic courts in the City of Philadelphia, such other courts as may be provided by law and justices of the peace. All courts and justices of the peace and their jurisdiction shall be in this unified judicial system.

Pa. Const. art. 5, § 1.

■ Because the ZHB is not a specified component of the unified judicial system,

proceedings before it do not constitute "litigation" for which counsel fees may be awarded under Section 2503 of the Judicial Code.[17] Accordingly, Ciavarelli's conduct before the trial court's involvement in this matter on February 9, 2012 cannot be the basis on which counsel fees are assessed.

Unlike Section 2503 of the Judicial Code, there is nothing in the Act restricting the trial court's look back at Ciavarelli's conduct. In light of the Court's limited interlocutory review, we hold that the trial court did not err as a matter of law and/or abuse its discretion by considering evidence and conduct that occurred before the September 21, 2011 filing of Ciavarelli's Application in deciding Ciavarelli's Immunity Motion.[18]

Based upon the foregoing, the trial court's order is affirmed.

## ORDER

AND NOW, this 17th day of September, 2014, the Montgomery County Common Pleas Court's November 1, 2013 order is affirmed.

---

17. Land use appeals and zoning appeals before a trial court would, by definition, constitute litigation. *See Penllyn Greene.*

18. This holding does not limit or expand the trial court's ultimate determination of the point in time from which it may consider Ciavarelli's conduct when deciding the Association's Petition.