RENDERED:  FEBRUARY 21, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-1097-MR

HOWARD K. BELL CONSULTING
ENGINEERS, INC. D/B/A BELL
ENGINEERING, INC.                                                                APPELLANT


|   | APPEAL FROM MADISON CIRCUIT COURT |
|---|---|
| v. | HONORABLE KRISTIN CLOUSE, JUDGE |
|   | ACTION NO. 19-CI-00679 |


FORD CONTRACTING, INC. AND
CITY OF BEREA                                                                         APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CALDWELL, COMBS, AND KAREM, JUDGES.

CALDWELL, JUDGE:  Howard K. Bell Consulting Engineers, Inc. ("Bell")

appeals from the Madison Circuit Court's denial of its motion for expedited

dismissal in an action related to a construction project dispute.  We affirm.

## FACTS

This case relates to disputes regarding the design and construction of a retaining wall near the B-Lake reservoir located south of Berea in Madison County, Kentucky. The reservoir is one of four maintained and operated by Berea Municipal Utilities ("BMU") in Berea College Forest. B-Lake, which provides a direct supply to BMU's water treatment plant, has an embankment dam at its northern edge. At some time prior to the central events underlying this appeal, a retaining wall at one of the dam's spillways had fallen into a state of disrepair and partially collapsed.

Appellant, Bell, is an engineering and land-surveying firm. In 2017, Bell contracted with the City of Berea ("the City") to supply its services toward repair of the collapsed retaining wall ("the Project"). This included preparation of plans and specifications for the construction of a new retaining wall and the associated excavation and re-grade of the adjoining hillside slope. Bell's services also included oversight of the Project's construction.

Ford Contracting, Inc. ("Ford") entered into a contract with the City in June of 2018. Ford agreed to construct the new retaining wall and to perform the associated earthwork for the Project. It is undisputed that Bell and Ford executed no formal contract with one another; each contracted separately with the City. It appears undisputed that Bell had a degree of authority to approve variations to its

plans and specifications, including having a role in issuing change orders requested by Ford.[1]

It also appears undisputed that, immediately after work on the Project began, Ford reported to Bell and the City it was encountering conditions at the worksite which required revision to Bell's plans and specifications. Conflicts and disputes between Bell and Ford followed and continued through the course of Ford's work.

The original date for the Project's completion passed with the work still incomplete. Eventually, the City terminated Ford's contract. At some time prior to this, Bell had prepared a diagram ("Topographic Report") that indicated it was a depiction of discrepancies between the "worked slope vs. design contours as of November 5, 2018[.]" The Topographic Report was tendered to the City by Bell. Bell's contention was that the Topographic Report demonstrated Ford had over-excavated the site and so the slope was not in compliance with the plans and specifications.

---

[1] Matters of detail and degree on this appear contested. Ford characterizes Bell as the "the construction manager" and "engineer of record" for the Project.

*Litigation History*

On November 1, 2019, Ford filed a lengthy civil complaint initiating the underlying matter, naming the City and Bell as defendants. Among Ford's allegations were the following:

> During Ford's performance of its obligations under the Contract, portions of the Project could not be completed due to the negligent design(s) provided by Bell. Bell further provided faulty and/or inadequate/incomplete information, guidance, and supervision to Ford. Ford timely notified Bell and the City of its concerns regarding the aforementioned issues with the design and management provided by Bell. However, despite the concerns raised by Ford, Bell and the City insisted that Ford proceed with its Work pursuant to design(s) and direction provided by Bell.

Ford's complaint stated nine separate causes of action against the City, including one for a breach of implied warranty. The complaint alleged "[t]he said Plans and Specifications prepared by Bell and provided by the City were not accurate or adequate or free from fault or defect[.]" Ford's complaint named a single cause of action against Bell – negligent misrepresentation. The complaint alleged, in part, that:

> the Project could not be completed due to the negligent design(s) provided by Bell. Bell further provided faulty and/or inadequate/incomplete information, guidance, and supervision to Ford. Ford timely notified Bell and the City of its concerns regarding the aforementioned issues with the design and management provided by Bell. However, despite the concerns raised by Ford, Bell and

-4-

the City insisted that Ford proceed with its Work
pursuant to design(s) and direction provided by Bell.

Ford's complaint further alleged Bell "owed a duty to Ford to supply true and accurate information to Ford for Ford's guidance in completing its Work and business transaction with the City of Berea" and:

> Bell was careless and negligent in performing its duties related to the Project, and supplied false information, guidance and oversight to Ford while Ford attempted to perform its Work on the Project. Bell made negligent misrepresentations, errors, and/or omissions in the plans and specifications for the Project. In addition, Bell made false statements to third parties including, without limitation, City personnel, regarding the quantity and quality of Ford's Work and the resulting delays in proceeding with said Work. Said statements were false and/or Bell knew or should have known that these statements were false.
>
> . . . Ford justifiably relied upon Bell's improper guidance, oversight, false statements and negligent misrepresentations by, inter alia, attempting to perform under the Contract as directed by Bell.

The record for the case demonstrates a contentious and convoluted history. A continuing topic before the trial court, leading up to Bell's motion now under appeal, was discovery disputes between Ford and Bell. On multiple occasions, Ford reported to the trial court it sought the surveys and/or data information which Bell had relied upon in its preparation of the Project's plans and specifications, as well as for its determination that Ford's work had not conformed to the plans and specifications.

-5-

Bell first moved for summary judgment in October of 2021. The City moved for summary judgment in November of 2021. Also in November, Ford filed a motion to compel, seeking all surveys completed by Bell. Bell's response to the motion indicated it had compared the City of Berea's survey information to the "as designed grade elevation" to determine Ford had not complied with the plans and specifications.

In the course of motion practice at this time, Ford submitted the deposition and an Affidavit of its representative, Cammle Ford, to the trial court. These indicated Ford's contention that the topographic data and geotechnical notes in Bell's plans and specifications for the Project were inaccurate. Cammle Ford's statements indicated significant portions of the excavation site contained shale and rock far closer to the surface than indicated in Bell's plans and specifications, while other parts of the site had issues with water seepage and mud which was nowhere reflected in the plans and specifications. Ford alleged this required work beyond the scope of the contract and necessitated a complete redesign of the plans for the Project, but agents of Bell ignored these documented concerns and refused to issue any change orders. Faced with the refusal, Ford continued the work to Bell's specification, but this inevitably resulted in delays and complications.

Ford disputed Bell's allegation the company had over-excavated the slope; he insisted his company had removed no more earth than required by Bell's

plans and specifications. This did require removing excessive amounts of earth, but this was necessary in reaching the slope's required grade while also ensuring the subsurface condition was suitable for placement of the new retaining wall.

Also disputed by Ford was Bell's allegation regarding the concrete work by Ford in construction of the new retaining wall. Bell alleged the concrete work was substandard and necessitated the engineering of a sister wall for installation as bracing. Ford alleged that, if a sister wall was indeed necessary, it was required because of problems with Bell's design. Ford insisted its concrete work was of a high standard that met specifications. Construction of the sister wall became another source of dispute between Ford with Bell and the City.

When Ford reached a state of what it maintains was substantial completion of the work, it went through a formal process of applying for payment and seeking approval of change orders. Rather than conceding its plans and specifications required modification to account for the actual conditions of the slope, Ford alleged Bell had falsely claimed Ford had not carried out the plan to specification.

In February 2022, the trial court granted summary judgment to the City as to Ford's causes of action, aside from the claim for Breach of Implied Warranty of Bell's Plans and Specifications. Bell's motion for summary judgment, however, was not considered at that time. At the hearing on the motions, the trial

court cited to a second deposition of Bell's Project Manager, which was ordered by the trial court but had still not occurred. This was the basis for its decision that the claim against Bell was not yet ripe for consideration of a dispositive motion.

Bell filed another motion for summary judgment the following month, on March 8, 2022. In that motion for summary judgment, Bell argued it was entitled to sovereign immunity. Ford's responsive pleadings indicated discovery disputes remained ongoing, particularly regarding any survey work and information which had been relied upon by Bell.

By November of 2022, Ford moved for leave to file an amended complaint. The proposed amended complaint added a count of negligence *per se* against Bell and the City. Ford alleged that, during the course of discovery, it had become aware of Bell's and the City's reliance upon an unlicensed surveyor's work. Ford alleged deposition testimony had established a BMU employee, who was not a licensed land surveyor, had performed surveying work at Bell's request. Ford alleged the BMU employee testified that a licensed surveyor who was formerly employed by the City had overseen his work. However, Ford tendered a deposition of that surveyor, indicating he denied any involvement or oversight of surveying work on the Project.

The proposed amended complaint restated the causes of action from the first complaint and added a count of negligence *per se* against both Bell and the

City, alleging that "Bell and the City breached their duty to comply with the Kentucky Revised Statutes as they allowed for a non-licensed individual to perform surveying work in violation of KRS[2] 322.020 and relied upon same."

Pursuant to Madison Circuit Court's expansion of divisions, a random redistribution of cases resulted in the case's transfer to a new division and judge in January 2023. Ford's motion for leave to amend its complaint, as well as Bell's motion(s) for summary judgment, were pending when the matter was inherited by the subsequent judge. On February 7, 2023, Bell filed a re-notice of its motion for summary judgment, indicating that among its previously filed motions, 13 distinct justifications for summary judgment had been argued. On February 16, 2023, a hearing before the trial court occurred. There, Bell tendered another memorandum in support of summary judgment which contained 10 separate paragraph headings identifying arguments in support of summary judgment. On that same date, the trial court orally announced it was granting Ford's motion to file an amended complaint.

On February 28, 2023, Bell filed an answer to Ford's amended complaint. Among the defenses therein listed, Bell stated Ford's claim was barred by KRS 454.462 *et. seq*. Also on that day, Bell filed a "Motion for Summary Judgment and Motion for Expedited Dismissal per KRS 454.464[.]" Although

---

[2] Kentucky Revised Statutes.

substantially similar to Bell's previous memorandum in support of summary judgment in many aspects, this pleading added an eleventh paragraph which argued for dismissal "under KRS 454.464[.]"

Oral arguments occurred at a hearing on Bell's motions before the trial court on March 27, 2023. The trial court issued a nine-page opinion and order denying Bell's motions, entered on August 16, 2023. The trial court's order addressed each of Bell's eleven arguments separately, including the motion for expedited dismissal.

On September 13, 2023, Bell filed its notice of appeal. This Court issued a show cause order on September 28, 2023. There, we noted that interlocutory appeals are not generally permitted for most of the grounds for dismissal stated in Bell's motions. Accordingly, we directed Bell to show cause why the issues on appeal should not be limited to the circuit court's denial of its claim of sovereign immunity and motion to dismiss under KRS 454.460 *et seq*.

Bell's response did not contain a clear argument for why the issues on appeal should not be limited. It stated we had correctly identified its grounds for appeal as the circuit court's denial of its motion for summary judgment and added that the issues before this Court were detailed more fully in Bell's prehearing statement. Bell's prehearing statement, we noted in the subsequent order,

"contains approximately 88 issues to be raised on appeal, most of which are not permitted for interlocutory appellate review."

After determining insufficient cause for consideration of interlocutory matters in this appeal had been shown by Bell, we ordered that:

> the issues on appeal SHALL BE LIMITED to (1) the circuit court's denial of Appellant's claim of sovereign immunity and (2) Appellant's claim that it is protected from liability arising from its actions per Kentucky's Uniform Public Expression Protection Act. The Court will not consider any other issues unrelated to sovereign immunity or the Uniform Public Expression Protection Act.

## ANALYSIS

Having noted the limited issues we have determined are within our jurisdiction, we begin our review by noting that we deem one of them, the trial court's denial of dismissal based on sovereign immunity, abandoned by Bell. Bell makes no argument regarding sovereign immunity and nowhere makes any specific allegation of error in the trial court's findings with regards to this specific issue. Ford's appellee brief argues Bell had abandoned the issue, pointing out that the word "sovereign" appeared nowhere in Bell's brief. Bell's reply brief contained no assertion the matter had been addressed or had not been abandoned.

### Standard of Review

Recently, in *Davenport Extreme Pools and Spas, Inc. v. Mulflur*, this Court examined at length Kentucky's version of the Uniform Public Expression

-11-

Protection Act ("UPEPA"), KRS 454.460-454.478, for the first time. 698 S.W.3d 140 (Ky. App. 2024). There we concluded that, for the review of a trial court's decision to grant or deny a motion for expedited dismissal filed under the UPEPA, the *de novo* standard of review is to be applied. *Id*. at 150.

The UPEPA is a procedural device.

Although we deem the issue of *sovereign* immunity waived by Bell, this is not to say there is no discussion of immunity in Bell's arguments before us. We will begin our substantive review by addressing Bell's arguments, citing to KRS 454.462(2)(b)1., asserting UPEPA itself "grants immunity for defendants sued for actions related to 'the gathering, receiving, posting, or processing of information for communication to the public.'" Bell elsewhere makes sweeping assertions it is entitled to "civil immunity" by virtue of UPEPA "for its efforts to alert the government as to Ford's faulty construction." Bell argues that, because of its preparation and communication to the City of the Topographic Report, UPEPA provides it protection which "is absolute, particularly while the government is considering whether to take action regarding a safety threat."

In support of these blanket statements, Bell cites or quotes little language directly from Kentucky's UPEPA statutes themselves. Instead, Bell cites extensively our Supreme Court's opinion in the case of *Seiller Waterman, LLC v. Bardstown Capital Corporation*, 643 S.W.3d 68 (Ky. 2022), *abrogated by*

*Bluegrass Trust for Historic Preservation v. Lexington*, 701 S.W.3d 196 (Ky. 2024). Bell contends *Seiller Waterman* stands for the remarkably broad proposition that Kentucky's UPEPA is among laws which "afford immunity from civil liability to anyone communicating information to any branch of government." However, Bell's assertions to this effect amount to a gross mischaracterization of any holding in the case.

In *Seiller Waterman*, the Kentucky Supreme Court concluded the *Noerr-Pennington*[3] doctrine protected First Amendment petitioning of government in zoning litigation. 643 S.W.3d at 80. As the *Seiller Waterman* Court indicated, UPEPA was still being considered by Kentucky's legislature when the opinion was rendered. *Id*. at 79-80. The presence of Anti-SLAPP[4] laws in most other jurisdictions, as well as the then-active consideration of UPEPA in the Kentucky legislature, were cited as "underscor[ing] that protection of the First Amendment right to petition is crucial and requires vigilance." *Id*. at 80.

---

[3] The *Noerr-Pennington* doctrine, offering protection to citizens for petitioning the government for redress of grievances, derives from two United States Supreme Court cases, *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S. Ct. 523, 5 L. Ed. 2d 464 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S. Ct. 1585, 14 L. Ed. 2d 626 (1965). Kentucky courts first formally recognized the doctrine's applicability in the context of zoning cases. *See Grand Communities, Ltd. v. Stepner*, 170 S.W.3d 411 (Ky. App. 2004).

[4] "SLAPP" is an acronym for Strategic Lawsuits Against Public Participation, characterized as litigation filed with the intent "to harass, intimidate or silence those individuals who use their right to petition."

-13-

Despite this, in his brief, Bell somehow conflates the Kentucky Supreme Court's discussion of the *Noerr-Pennington* doctrine with a holding that Kentucky's UPEPA statutes "afford immunity from civil liability to *anyone* communicating information to *any branch* of the government." (Emphasis added.) Despite the UPEPA being only in consideration by the legislature at the time *Seiller Waterman* was rendered, Bell argues the case requires we give a "broad reading" to UPEPA which extends immunity under the *Noerr-Pennington* doctrine to any cause of action involving allegations about a party's communications with the government.

We reject this argument. As we found in *Davenport*, UPEPA is "a procedural or remedial change that does not alter or abolish any common-law right of recovery[.]" 698 S.W.3d at 146. Rather than an expansion or contraction of any parties' substantive rights, the statutes themselves "fall squarely in the procedural category; they provide procedures that permit expedited consideration of already-existing substantive protections." *Id*. at 151. "Kentucky's UPEPA statutes permit a special motion for expedited relief to dismiss with prejudice a cause of action." *Id*. (citing KRS 454.464, 454.472). Bell's filing of its expedited motion for dismissal under UPEPA was "purely procedural and in no way alter[ed] or impair[ed its] vested rights." *Id*. at 151.

Bell argued much the same to the trial court, who rejected this characterization: "Bell's interpretation of the [UPEPA] in this situation would allow Bell to act in a fraudulent or negligent manner and then report the danger created as a result with the consequence being immunity from lawsuit." We agree with the trial court's finding and summarily reject Bell's contention the UPEPA statutes serve to grant it immunity from civil liability.

<u>Bell's motion for expedited dismissal was not timely filed, per KRS 454.464, as to Ford's claim for negligent representation.</u>

Among its reasons for finding UPEPA was not applicable to Ford's causes of action against Bell, the trial court found Bell had not filed its motion in a timely manner, per KRS 454.464. Bell argues its motion was timely as it was asserted within 60 days of the trial court's granting Ford's motion to file an amended complaint. Ford argues its amended complaint restated the negligent misrepresentation claim against Bell in the exact form as when its original complaint was filed years prior.

KRS 454.464 holds that:

> No later than sixty (60) days after a party is served with a complaint, crossclaim, counterclaim, third-party claim, or other pleading that asserts a cause of action to which KRS 454.460 to 454.478 applies, or at a later time on a showing of good cause, the party may file a special motion for expedited relief to dismiss the cause of action in whole or in part.

*Id.*

-15-

Ford's original complaint was filed November 1, 2019. As the trial court noted, "the case was pending when [UPEPA] went into effect on July 14, 2022." Ford's motion for leave to file an amended complaint, however, was granted on February 16, 2023. Bell filed the memorandum which included his motion for "expedited dismissal under KRS 454.464" on February 28, 2023. Along with the memorandum including the motion for expedited dismissal, Bell filed an answer to the amended complaint on February 28, 2023. In that answer, among Bell's asserted defenses is the assertion that Ford's claims were "barred by 454.462, *et seq.*"

We agree with Ford regarding the negligent misrepresentation claim. Bell had 60 days from UPEPA taking effect on July 22, 2022, to file a motion for expedited dismissal as to that claim. However, as to the negligence *per se* claim, we agree with Bell that its motion was timely filed under KRS 454.464. The statute indicates that being served with any other pleading that asserts a cause of action – not just the original complaint – would begin accrual of the 60-day statutory period. Accordingly, we assess whether the trial court erred in its determination UPEPA was inapplicable to Ford's negligence *per se* claim. The Trial Court correctly applied 454.462(1).

When filing a motion to dismiss under UPEPA, the moving party's initial burden is to establish UPEPA's applicability to the cause of action for one of

-16-

the reasons stated in KRS 454.462(1).  *See Davenport*, 698 S.W.3d at 152 (citing

KRS 454.472(1)(a)).  Turning to the language of KRS 454.462(1), UPEPA:

> applies to a cause of action asserted against a person
> **based on** the person's:
>
>> (a) Communication in a legislative, executive,
>> judicial, administrative, or other governmental
>> proceeding;
>>
>> (b) Communication on an issue under
>> consideration or review in a legislative, executive,
>> judicial, administrative, or other governmental
>> proceeding; or
>>
>> (c) Exercise of the right of freedom of speech or of
>> the press, the right to assemble or petition, or the
>> right of association, as guaranteed by the United
>> States Constitution or Kentucky Constitution, on a
>> matter of public concern.

*Id*. (emphasis added).[5]

KRS 454.462(1), along with KRS 454.462(2)[6], "ask[s] the following

question:  Do the facts *and the claims* in this case fall under certain categories of

free expression?"  *Davenport*, 698 S.W.3d at 152 (emphasis added).

---

[5] "Person" means an individual, estate, trust, partnership, business or nonprofit entity, governmental unit, or other legal entity.  KRS 454.460(5).

[6] Appellee's brief argues any of Bell's communications fall under the exclusionary clause in KRS 454.462(2)(a)(3) and UPEPA is, accordingly, inapplicable.  *See Davenport*, 698 S.W.3d at 154.  This was not specifically argued before the trial court.  A trial court examines whether one of the ten exclusionary instances applies during the second of a UPEPA's three-pronged framework.  *Id*. at 152.  Here, it appears the trial court reached its determination before

-17-

Although Bell's arguments allude to language from subsections (a) and (b) of KRS 454.462(1), subsection (c) is predominantly referenced by Bell. Emphasizing the reservoir as a source to BMU for drinking water and the possibility of flooding in the event of catastrophe at the dam, Bell characterizes the Project as a matter of public concern and his communication of the Topographic Report as an exercise of First Amendment rights.

In *Davenport*, we recognized that the breadth of KRS 454.462(1)(c) and of UPEPA's applicability in general, was considerable. 698 S.W.3d at 155. However, in *Davenport*, whether the communications at issue formed the *basis* of the challenged causes of action was not an issue in dispute or requiring extensive examination. In this case, discussing which allegations formed the nexus of Ford's causes of action against Bell, the trial court found:

> [T]his lawsuit does not arise out of a communication by Bell or its petition to the government – that is not the tortious conduct alleged. The claim does not arise from a protected action. Relying on unlicensed surveyors and/or fraudulent misrepresentation to Ford are not protected.

When a trial court must decide a motion for expedited dismissal under UPEPA, KRS 454.470 requires it to "consider the pleadings, the motion, any reply or response to the motion, and any evidence that could be considered in ruling on a

---

examination of KRS 454.462 was prompted. In any event, we do not reach the issue as it is unnecessary to our resolution.

-18-

motion for summary judgment." Here, the trial court appears to have done just that, and indicated in its order it had "reviewed the file and the Affidavits, exhibits, documents" as well as the oral arguments presented at the hearing on Bell's motions.

To this court, as to the trial court, Bell argues the Topographic Report is the "linchpin" to Ford's "entire lawsuit." Bell focuses exclusively on data which was included in the Topographic Report and communicated to the City just prior to the termination of Ford's contract.

Ford argued to the trial court much the same as it does here, that neither cause of action is based upon any communication or activity of Bell's to which UPEPA applies. Rather, the real basis was in Bell's actions in soliciting and relying upon the erroneous work of an unlicensed surveyor. In its arguments, Ford focuses upon its allegation that Bell relied upon incorrect and illicitly gathered data from an unlicensed surveyor in preparation of the preconstruction plans and specifications prepared by Bell. Ford characterizes the preconstruction surveying data as central to its allegations and alleges error in this data being carried through or compounded by Bell to the end of Ford's involvement in construction of the Project.

Ford cites to case law from other jurisdictions addressing similar questions in the context of anti-SLAPP statutes. In particular, Ford quotes caselaw

noting "a careful distinction between a cause of action based squarely on a privileged communication, such as an action for defamation, and one based upon an underlying course of conduct evidenced by the communication." *Park v. Board of Trustees of Cal. State Univ*., 393 P.3d 905, 909 (Cal. 2017) (citation omitted). This is a "distinction between activities that form the basis for a claim and those that merely lead to the liability-creating activity or provide evidentiary support for the claims." *Id*. In other caselaw cited by Ford, a threshold determination is described where a trial court must "distinguish between . . . speech or petitioning activity that is mere evidence related to liability and . . . liability that is *based on* speech or petitioning activity." *Graffiti Protective Coatings, Inc. v. City of Pico Rivera*, 181 Cal. App. 4th 1207, 1214-1215 (2010).

We agree examination of other jurisdictions' precedent of this question in the context of anti-SLAAP law is useful.[7] In *Davenport*, we particularly noted similarities between California's Anti-SLAPP statute and Kentucky's UPEPA statutes. 698 S.W.3d at 154. The reasoning in these cases, regarding this issue, is persuasive. It is only logical that "[p]relitigation communications . . . may provide evidentiary support for the complaint without

---

[7] The official comments to UPEPA note that "[a]lthough 'SLAPP' . . . does not appear in the Act's title, the Uniform Public Expression Protection Act should be considered an anti-SLAPP act." Uniform Public Expression Protection Act, National Conference of Commissioners on Uniform State Laws (2020), § 1, at 5.

being a basis of liability." *Graffiti Protective Coatings, Inc.*, 181 Cal. App. 4th at 1215.

The official comments to UPEPA note that a moving party's initial burden to establish UPEPA's applicability is twofold; the movant must establish "that it engaged in conduct that fits one of the three categories spelled out in [KRS 454.461(1)]" as well as establishing "that the moved-upon cause of action is premised on that conduct." Uniform Public Expression Protection Act, National Conference of Commissioners on Uniform State Laws (2020), § 7, at 17 (citing *City of Cotati v. Cashman*, 52 P.3d 695, 701 (2002)). Accordingly, under UPEPA's procedural framework, it is appropriate for a court to begin with a determination of what allegations form the basis of each challenged cause of action and then determine whether those allegations are within the scope of UPEPA by examining KRS 454.462. *See Wallace v. McCubbin*, 196 Cal. App. 4th 1169, (2011).

Bell points to Ford's amended complaint in support of this contention: "Ford admits that it amended its complaint in February 2023 to bring new claims against Bell arising from the information Bell gathered, processed, and communicated to Berea about the faulty construction work at the dam." Regarding the cause of action for negligence *per se*, the amended complaint alleged a statutory violation:

> Bell and the City breached their duty to comply with the Kentucky Revised Statutes as they allowed for a non-licensed individual to perform surveying work in violation of KRS 322.020 and relied upon same.

Here, Bell's communication of the Topographic Report to the City is significant to Ford's allegations in establishing the events leading up to the City's termination of its contract. However, Ford's negligence *per se* claims is not based on the communication – the liability is premised on alleged violation of state laws regarding unlicensed land surveying. *See Graffiti Protective Coatings, Inc.*, 181 Cal. App. 4th at 1215.

While Bell alleges Ford's amended complaint brought "new claims" for both negligence *per se* and negligent representation, Ford's allegations regarding negligent representation simply restated the same language as the original complaint. Nonetheless, the allegations concerning negligent misrepresentation are not based in Bell's creating or communicating to the City the Topographic Report:

> Bell was careless and negligent in performing its duties related to the Project, and supplied false information, guidance and oversight to Ford while Ford attempted to perform its Work on the Project. Bell made negligent misrepresentations, errors, and/or omissions in the plans and specifications for the Project.

These allegations appear to involve only the preconstruction surveying data. The communications by Bell referenced in these allegations are to

-22-

Ford. They do not involve Bell's later communication of the Topographic Report

to the City. The elements of negligent representation, as outlined in the

*Restatement (Second) of Torts* § 552, require:

> (1) One who, in the course of his business, profession or
> employment, or in any other transaction in which he has
> a pecuniary interest, supplies false information for the
> guidance of others in their business transactions, is
> subject to liability for pecuniary loss caused to them by
> their justifiable reliance upon the information, if he fails
> to exercise reasonable care or competence in obtaining or
> communicating the information.

*Id. See also Presnell Const. Managers, Inc. v. EH Const., LLC*, 134 S.W.3d 575

(Ky. 2004).

While allegations likely related to the Bell's creation and

communication to the City of the Topographic Report do appear in Ford's lengthy

amended complaint, the primary basis of Ford's negligent misrepresentation cause

of action is Bell's supplying allegedly false information *to Ford* within the plans

and specifications. Ford's allegation here is it was harmed by its own reliance on

the information provided by Bell. We discern no error in the trial court's finding

Bell failed to establish the Topographic Report was the basis of Ford's causes of

action under KRS 454.462(1). Further arguments in the parties' briefs have been

determined to lack merit or relevancy to our resolving this appeal.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the judgment of the Madison Circuit Court.

ALL CONCUR.

BRIEFS FOR APPELLANT:

John D. "Chip" Clay, Jr.
Louisville, Kentucky

BRIEF FOR APPELLEE FORD CONTRACTING, INC.:

Scott A. Schuette
Lexington, Kentucky